#26812-a-DG & SLZ

**2014 S.D. 38**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JOSEPH BURKETT,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WARREN G. JOHNSON
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                         and appellee.

KIRK W. ALBERTSON
Office of the Lawrence County
 Public Defender
Deadwood, South Dakota                    Attorneys for defendant
                                         and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MARCH 24, 2014
OPINION FILED **06/25/14**

#26812

GILBERTSON, Chief Justice, and ZINTER, Justice

[¶1.]        **Chief Justice Gilbertson delivers the majority opinion of the Court as to Issue 2 and Issue 3. Justice Zinter delivers the majority opinion of the Court as to Issue 1.**

[¶2.]        **GILBERTSON, Chief Justice, writing for the Court on Issue 2 and Issue 3.**

[¶3.]        Joseph Burkett appeals his conviction for third offense driving under the influence (DUI). We affirm.

## Facts and Procedural History

[¶4.]        On January 26, 2013, Joseph Burkett visited a Napa Auto Parts store near Deadwood, South Dakota. Burkett entered the store around 11:00 a.m., where he was assisted by one of the store's clerks, Steve Henderson. Burkett left the store without purchasing anything, but returned later in the day. Henderson testified that he could smell alcohol on Burkett when Burkett entered the store the second time.

[¶5.]        Around 3:30 p.m., Burkett entered the Napa store a third time. Henderson testified that he detected a "strong alcohol odor" emanating from Burkett. According to Henderson, Burkett was "incoherent" and was "slurring" his words. Henderson testified that Burkett began to leave the store on several occasions, but would reenter the store to request various "oddball" items. Henderson stated that he felt uncomfortable placing the orders for Burkett because he suspected Burkett would not return to purchase the items in his condition.

[¶6.]     Upon exiting the store Burkett entered into his light blue Dodge van. Henderson observed that Burkett revved his engine and appeared to have trouble shifting the van into reverse. Henderson testified that as Burkett left the Napa parking lot, Burkett's tires "chirped" as he reversed, and then "screeched" out of the parking lot.

[¶7.]     Henderson called 911 to report seeing a driver "under the influence" leaving the store and headed toward Deadwood. He provided dispatch with a description of Burkett's van and the license plate number. Henderson identified himself by name and included his personal phone number and home address. However, Henderson requested that the tip remain anonymous. Dispatch passed along Henderson's concerns of the possibility of an impaired driver, but did not disclose Henderson's name to the officers.

[¶8.]     Officer Justin Lux was on patrol when dispatch notified him of a possible impaired driver. Officer Lux saw a van meeting Henderson's description and matching the reported license plate number driving through Deadwood toward the address registered to the vehicle. The officer turned his patrol car around and began following the van. Officer Lux testified that when he finally reached the van, it was stopped in the middle of a residential street and revving its engine for no apparent reason. The van resumed driving forward for one block and turned right into a residential driveway. Officer Lux stated that the van's right, rear wheel drove over the curb and that once the van reached the driveway the van's driver "hit the brakes hard and the vehicle skidded forward a short distance before stopping."

[¶9.]     Officer Lux activated his emergency lights and pulled in front of the driveway where Burkett's vehicle was parked. Burkett was exiting from the vehicle when the officer approached him. Although Officer Lux's patrol car video system was active, his car was parked in such a manner that only the audio recording portrays the interaction between Officer Lux and Burkett.

[¶10.]     Officer Lux questioned Burkett about why he stopped in the middle of the road. Burkett claimed that his carburetor was malfunctioning. When asked if he had been drinking, Burkett paused, and stated he had not. Officer Lux testified that Burkett "slurred" his words, "swayed" where he stood, was "nervous," "belligerent," "uncooperative," "evasive," "confused," and smelled like alcohol. Burkett declined a preliminary breath test and declined to participate in field sobriety tests. Nevertheless, Officer Lux concluded that based on his observations Burkett had been driving under the influence, and he placed Burkett under arrest.

[¶11.]     Following his arrest, Burkett was formally charged with DUI. Because Burkett had two prior DUI convictions within ten years of the current offense, the State sought to enhance Burkett's charge to a third offense DUI under SDCL 32-23-4. Burkett moved to suppress the evidence against him. He challenged both the admissibility of the blood alcohol concentration (BAC) test and whether Officer Lux unlawfully stopped him. The circuit court suppressed the BAC test; however, the court determined that Officer Lux's stop was lawful. Burkett also sought to strike the first of his two prior DUI convictions. The court denied Burkett's motion to strike his predicate convictions. At trial, Burkett moved for an acquittal based on the insufficiency of the State's evidence. The circuit court denied this motion, and

the jury found Burkett guilty of DUI. Based on the two prior DUI convictions Burkett was sentenced to a Class 6 felony.

[¶12.]     Burkett appeals his conviction, raising the following issues:

    1.    Whether the use of Burkett's prior DUI convictions for sentencing enhancement purposes violated his right to due process.

    2.    Whether there was sufficient evidence to support a conviction of driving under the influence.

    3.    Whether the circuit court erred in denying Burkett's motion to suppress based on Officer Lux's stop of Burkett.

**Analysis and Decision**

[¶13.]     1.    *Whether the use of Burkett's prior DUI convictions for sentencing enhancement purposes violated his right to due process.*

[¶14.]     Burkett argues that the use of his prior DUI convictions for sentencing enhancement purposes violated his right to due process. He alleges that his March 2003 plea was constitutionally infirm under *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). In response, the State contends that even if Burkett's March 2003 plea was constitutionally infirm, Burkett's ability to challenge the validity of that plea is procedurally waived because he admitted to the March 2003 plea when he pleaded guilty to a different DUI offense in August 2003.[1]

---

1.    In support of its argument that Burkett's claim is procedurally waived, the State cites *State v. Robinson*, 469 N.W.2d 376 (S.D. 1991). *Robinson* involved a series of challenges by the defendant to his conviction. When the defendant was convicted, he was also sentenced as a habitual offender by part II information. The defendant never challenged the part II information. Ultimately, the defendant obtained a new trial on the underlying felony. When the case was retried, the trial court rejected defendant's challenge to the part II information, indicating that he had already pleaded guilty to the

(continued . . .)

#26812

[¶15.]     In *State v. King*, 383 N.W.2d 854, 856 (S.D. 1986), this Court held that "a constitutionally infirm conviction cannot be used to enhance [a] sentence under our habitual offender statutes." *Id.* (citing *Application of Garritsen*, 376 N.W.2d 575 (S.D. 1985)). As a result, we stated that "a defendant may challenge the constitutional validity of a prior conviction whenever it is used as a basis for augmenting punishment." *Id.* (citation omitted). Additionally, we instructed that "[a] motion to strike a prior conviction allegation from an accusatory pleading is a proper vehicle for attacking such conviction if the presence of the prior will activate the statutory machinery relating to penal status or severity of sanction in a subsequent criminal proceeding." *Id.* (quoting *In re Rogers*, 619 P.2d 415, 417 (Cal. 1980)). *King* appears to be the first time we allowed a defendant to collaterally challenge a predicate conviction whenever it is used to enhance a sentence.[2] *See id.* Since *King*, this Court has allowed defendants to raise what we will refer to as a "*King* challenge" without much restriction. *See, e.g., State v. Smith*, 2013 S.D. 79, ¶ 5, 840 N.W.2d 117, 119 (allowing a defendant to collaterally attack a predicate DUI conviction when it was used for sentence enhancement).

_____

(. . . continued)

part II information. We affirmed that conviction, noting that it was not error to leave the defendant's part II information "undisturbed." *Id.* at 379. While *Robinson* is distinguishable from the case at hand, it provides useful guidance for our analysis.

2.     *King* cites to *Garritsen*, 376 N.W.2d at 576. *Garritsen* was brought as a habeas proceeding. *Id.* at 576. Furthermore, *Garritsen* simply declared that a constitutionally infirm prior guilty plea "cannot stand," without citing any authority as to the proper procedure for vacating such a plea or the constitutional necessity of allowing a collateral attack. *See id.* at 578.

-5-

[¶16.]    In asking us to limit Burkett's ability to raise this *King* challenge, the State leads us to question the very nature of these kinds of collateral attacks in South Dakota. Burkett frames the denial of his *King* challenge as a violation of his due process rights. Although we initially permitted *King* challenges based on due process considerations, that justification is no longer valid under federal constitutional standards.

[¶17.]    When this Court first outlined the remedy of a *King* challenge, it did not rely on statutory interpretation of South Dakota law. *See King*, 383 N.W.2d at 856. Nor did this Court point to the common law as recognizing such a remedy. *See id.* Instead, this Court adopted a blanket rule from California that this special type of collateral attack was required by due process. *Id.* (citing *Rogers*, 619 P.2d at 417).[3] And since *King*, this Court has allowed defendants to collaterally attack any allegedly constitutionally infirm predicate conviction used for sentence enhancement—even if the constitutionality of the predicate conviction had never previously been raised.

[¶18.]    However, since our holding in *King* the United States Supreme Court has defined what protections are afforded to a defendant who seeks to challenge a predicate conviction used for sentencing enhancement. *See Custis v. United States*, 511 U.S. 485, 114 S. Ct. 1732, 128 L. Ed. 2d 517 (1994). In *Custis*, the defendant challenged the use of prior convictions to enhance sentencing on federal drug and

---

3.    In *Rogers*, the California Supreme Court relied on *People v. Coffey*, 430 P.2d 15 (Cal. 1967), which prohibited the use of a constitutionally infirm conviction "for any purposes in criminal proceedings." 619 P.2d at 417. *Coffey* explained that such use was "violative of the due process clause of the Fourteenth Amendment." 430 P.2d at 25.

firearm charges brought against him. *Id.* at 488, 114 S. Ct. at 1734. Like Burkett, Custis alleged that one of his predicate convictions was the result of a guilty plea that was not entered knowingly and voluntarily. *Id.* Because the conviction was therefore attained in violation of *Boykin*, Custis argued that the constitutional infirmity should prevent that conviction from being used for sentence-enhancement purposes. *Id.* The lower courts held that the federal statute under which Custis was convicted did not authorize a procedure by which Custis could collaterally attack the constitutionality of his predicate convictions, and therefore refused to entertain his collateral challenge. *Id.* at 489, 114 S. Ct. at 1735.

[¶19.]     On appeal to the United States Supreme Court, Custis argued that the United States Constitution required some procedural avenue to challenge the constitutionality of his prior convictions when used for sentence enhancement. *Id.* at 493, 114 S. Ct. at 1737. The United States Supreme Court explicitly rejected this argument, holding that only the "unique constitutional defect" of failure to appoint counsel would allow for a collateral challenge of a predicate conviction in a sentence enhancement setting. *Id.* at 496, 114 S. Ct. 1738.

[¶20.]     In reaching its decision, the Supreme Court reasoned:

> As we have explained, "[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures" and inevitably delay and impair the orderly administration of justice. *United States v. Addonizio,* 442 U.S. 178, 184, n.11, 99 S. Ct. 2235, 2240, n.11, 60 L. Ed. 2d 805 (1979). We later noted in *Parke v. Raley,* 506 U.S. 20, 113 S. Ct. 517, 121 L. Ed. 2d 391 (1992), that principles of finality associated with habeas corpus actions apply with at least equal force when a defendant seeks to attack a previous conviction used for sentencing. By challenging the previous conviction, the defendant is asking a district court "to deprive [the] [state-court judgment] of [its] normal force and effect in a proceeding that ha[s] an

> independent purpose other than to overturn the prior judgmen[t]." *Id.*, at 30, 113 S. Ct., at 523. These principles bear extra weight in cases in which the prior convictions, such as one challenged by *Custis*, are based on guilty pleas, because when a guilty plea is at issue, "the concern with finality served by the limitation on collateral attack has special force." *United States v. Timmreck,* 441 U.S. 780, 784, 99 S. Ct. 2085, 2087, 60 L. Ed. 2d 634 (1979) (footnote omitted).

*Id.* at 497, 114 S. Ct. at 1739 (alterations in original).

[¶21.] In *King*, the State, citing *Burgett v. Texas*, 389 U.S. 109, 88 S. Ct. 258, 19 L. Ed. 2d 319 (1967), argued that "only convictions resulting from uncounseled guilty pleas are constitutionally infirm for enhancement purposes." 383 N.W.2d at 857. This Court, citing *Lewis v. United States*, 445 U.S. 55, 100 S. Ct. 915, 63 L. Ed. 2d 198 (1980), rejected the State's position. *King*, 383 N.W.2d at 857. We stated that "[w]hen the proper use of the constitutionally infirm conviction depends upon the reliability rather than the mere fact of conviction, the use of that conviction to support guilt or enhance punishment is unconstitutional." *Id.* (quoting *Santillanes v. U.S. Parole Comm'n*, 754 F.2d 887, 889 (10th Cir. 1985)).

[¶22.] However, in *Custis*, the United States Supreme Court clarified *Lewis*. The Court stated that "*Lewis . . .* supports the conclusion that prior convictions used for sentence enhancement purposes under [18 U.S.C.] § 924(e) are not subject to collateral attack in the sentence proceeding." *Custis*, 511 U.S. at 492, 114 S. Ct. at 1736. The Supreme Court thereby explained that even if a prior conviction clearly suffered from constitutional infirmity other than deprivation of right to counsel,[4]

---

4. The United States Supreme Court further curtailed the ability to raise such a collateral attack in *Nichols v. United States*, where the court clarified that an uncounseled misdemeanor conviction may also be used for enhancement

(continued . . .)

the United States Constitution does not give the defendant the right to challenge the alleged infirmity in a later enhanced-sentence proceeding. *See id.* at 497, 114 S. Ct. at 1739. Therefore, due process concerns only allow a defendant to raise a *King* challenge in very narrow circumstances such as the deprivation of the right to counsel. Burkett's *King* challenge is not one of those circumstances protected by due process.

[¶23.] Burkett's *King* challenge also fails to find support in our codified law. Our penalty enhancement statutes impose no greater statutory burden of proving the validity of a prior conviction than the federal law at issue in *Custis* or *Lewis*.[5] Nor do our enhanced-penalty statutes provide a procedure for attacking the validity of predicate convictions when used for sentence enhancement. *See id.* at 491, 114 S. Ct. at 1736 (recognizing that some federal repeat-offender laws set forth specific

---

(. . . continued)
purposes, so long as no prison term was imposed for the misdemeanor conviction. 511 U.S. 738, 748-49, 114 S. Ct. 1921, 1928, 128 L. Ed. 2d 745 (1994).

5.  *Compare* SDCL 32-23-4 (imposing enhanced penalty for third DUI conviction "[i]f conviction for a violation of SDCL 32-23-1 is for a third offense"), *and* SDCL 22-7-7 (imposing enhanced penalty "[i]f a defendant has been convicted of one or two prior felonies under the laws of this state or any other state or the United States"), *with Custis*, 511 U.S. at 491, 114 S. Ct. at 1735-36 (examining federal statute requiring enhanced punishment for any person who "has three previous convictions by any [enumerated court] for a violent felony or serious drug offense"), *and Lewis*, 445 U.S. at 60, 100 S. Ct. at 918 (interpreting 18 U.S.C. § 1202(a)(1), which was aimed at any person who "has been convicted by a court of the United States or of a State . . . of a felony").

procedures for challenging the validity of a prior conviction used for enhancement purposes). There is no statutory authority to support Burkett's *King* challenge.[6]

[¶24.] Further, in setting the standard for *King* challenges we have stated that "[o]ur review of a collateral attack of a predicate conviction is limited to *jurisdictional errors.*" *State v. Jensen,* 2011 S.D. 32, ¶ 11, 800 N.W.2d 359, 364 (emphasis added) (citations omitted); *see also Smith,* 2013 S.D. 79, ¶ 6, 840 N.W.2d at 119. Under this standard, we have allowed defendants to move to strike a predicate conviction when it was obtained in violation of *Boykin* because such a violation constituted a "jurisdictional error." *See Smith,* 2013 S.D. 79, ¶ 6, 840 N.W.2d at 119. Seemingly, we borrowed this definition of jurisdictional error from our habeas line of cases. *See King,* 383 N.W.2d at 856 (citing *Garritsen,* 376 N.W.2d at 578). In habeas proceedings, we have embraced the "fiction" that constitutional violations in criminal cases are jurisdictional errors. *See Goodroad v. Solem,* 406 N.W.2d 141, 143 (S.D. 1987) (citing *Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)). Therefore, under South Dakota law, defendants have been able to raise *Boykin* violations through a petition for habeas relief because a *Boykin* violation has been defined as a "jurisdictional error." *See Monette v. Weber,* 2009 S.D. 77, 771 N.W.2d 920.

[¶25.] However, habeas is a statutory remedy in South Dakota, which has been virtually unchanged since its inception. *See generally* SDCL 21-27-16. By contrast, *King* challenges are supported by neither statute nor common law.

---

6. SDCL 15-6-12(f) only permits a party to move to strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Instead, a *King* challenge is a relatively new judicial construct that has become virtually unrestrained and fraught with inconsistencies.

[¶26.] In *Custis*, the Supreme Court not only rejected Custis's due process argument, but it also rejected the idea that an alleged *Boykin* violation is a jurisdictional error in the context of a motion to strike a predicate conviction. 511 U.S. at 496, 114 S. Ct. at 1738. While the Court stated that the unique constitutional defect of the failure to appoint counsel does amount to a jurisdictional defect, a *Boykin* violation does not "rise[ ] to the level of a jurisdictional defect resulting from the failure to appoint counsel[.]" *Id.* Under *Custis*, Burkett's *King* challenge fails to raise a jurisdictional error and has no support under the Federal Constitution or South Dakota codified law. Therefore, we must consider whether Burkett's *King* challenge, based on an alleged *Boykin* violation, is cognizable.

[¶27.] While we have not yet considered the implications of *Custis* on *King* challenges in this state, other states have followed the constitutional analysis and policy considerations in *Custis*. Many states have recognized that constitutional considerations do not require courts to entertain collateral attacks on prior convictions used for enhancement purposes unless the defendant claims the predicate conviction was uncounseled. *See State v. Johnson*, 38 A.3d 1270, 1278 (Me. 2012); *Camp v. State*, 221 S.W.3d 365, 369-70 (Ark. 2006); *State v. Weber*, 90 P.3d 314, 319-20 (Idaho 2004); *State v. Veikoso,* 74 P.3d 575, 582-83 (Haw. 2003); *State v. Hahn,* 618 N.W.2d 528, 535 (Wis. 2000); *State v. Louthan*, 595 N.W.2d 917, 926-27 (Neb. 1999); *State v. Mund,* 593 N.W.2d 760, 761-62 (N.D. 1999); *State v. Weeks,* 681 A.2d 86, 89-90 (N.H. 1996); *State v. Delacruz,* 899 P.2d 1042, 1049 (Kan.

1995); *McGuire v. Commonwealth,* 885 S.W.2d 931, 937 (Ky. 1994), *People v. Carpentier,* 521 N.W.2d 195, 199-200 (Mich. 1994). In contrast, a smaller number of states have examined *Custis* and explicitly declined to adopt the reasoning based on an interpretation that the state's constitution offers greater protection than that afforded by the United States Constitution. *See, e.g.*, *State v. Maine*, 255 P.3d 64, 73 (Mont. 2011) (allowing collateral attacks under interpretation of the Montana constitution); *Paschall v. State*, 8 P.3d 851, 852 n.2 (Nev. 2000) (declining to bar collateral attack because *Custis* "merely established the floor for federal constitutional purposes").

[¶28.] Although we acknowledge that this Court has the ability to grant greater protection under the South Dakota Constitution than is afforded under the United States Constitution, we have stated that to do so is a "significant undertaking." *Gilbert v. Flandreau Santee Sioux Tribe*, 2006 S.D. 109, ¶ 23, 725 N.W.2d 249, 258 (citation omitted). It has been noted that "[a]uthoritative and neutral analysis of South Dakota's Constitution cannot advance from episodic and reactionary borrowing of results from other state courts." *State v. Schwartz*, 2004 S.D. 123, ¶ 57, 689 N.W.2d 430, 445 (Konenkamp, J., concurring). "[W]e cannot simply assume that our Constitution mandates greater protections than those available under the Federal Constitution." *Id.* at ¶ 31, 689 N.W.2d at 438. (Konenkamp, J., concurring).[7]

---

7. Reference to South Dakota's Constitutional Debates provides no support for an expansive definition of South Dakota's due process clause. During the 1885 Constitutional Convention a due process clause was adopted in the Bill of Rights without further reference. *See generally* 1 South Dakota

(continued . . .)

[¶29.]     Despite this guidance, it is apparent that by allowing *King* challenges like Burkett's—in the name of due process—we have granted greater protection than is required by the Federal Constitution. We have done so without sound judicial interpretation as to why due process guarantees of the South Dakota Constitution would require the courts of this state to entertain Burkett's *King* challenge when the Federal Constitution does not mandate this sort of relief. While we acknowledge that *King* challenges have been a form of collateral relief for nearly 30 years in South Dakota, "[r]econsideration of precedent is appropriate where a shift in position results from [an] intervening development of the law through the growth of judicial doctrine or through further action taken by a legislative body." *Hohm v. City of Rapid City*, 2008 S.D. 65, ¶ 20, 753 N.W.2d 895, 906 (citation omitted).

[¶30.]     Given *Custis* and the overwhelming body of case law rejecting the position we outlined in *King,* we must reconsider whether Burkett's *King* challenge is still an appropriate avenue for relief. Like the defendant in *Custis,* Burkett has already been afforded due process of law. Burkett seeks to invalidate a conviction that is nearly ten years old. He had the opportunity to challenge the constitutional validity of his prior conviction on direct appeal. SDCL 23A-32-2. Yet now, many

---

(. . . continued)

Constitutional Debates, 131, 281 (Huronite 1907). Likewise in 1889 the Constitutional Convention once again adopted a due process clause without further debate or elaboration. *See generally* 2 South Dakota Constitutional Debates, 131 (Huronite 1907). The Bill of Rights adopted by the preliminary 1883 Constitutional Convention does not appear to even contain a due process clause. *See generally* South Dakota Historical Society, *Journal of the Constitutional Convention of 1883*, in 21 South Dakota Historical Collections 291, 339-42 (1942).

years after the timeframe contemplated by the Legislature within which to bring statutorily-recognized challenges, Burkett seeks for the first time to challenge his March 2003 plea through the mechanism offered by *King*.[8]  Notably, Burkett does not claim that he is innocent of the crime to which he pleaded guilty.  Nor does he assert that his plea was coerced.  Burkett's only contention is that his plea was not entered knowingly and voluntarily because the court did not adequately advise him of his *Boykin* rights.  As was a concern with the United States Supreme Court, this type of delayed attack forces circuit courts and this Court to "rummage through frequently nonexistent or difficult to obtain . . . records that may date from another era, and may come from any one of the 50 States."  *Custis*, 511 U.S. at 496, 114 S. Ct. at 1738-39.

[¶31.]	In addition to the fact that Burkett's *King* challenge is not guaranteed by statute or due process as discussed above, these types of challenges also erode the deeply-rooted interest in the finality of criminal judgments.  We have stated that "[o]ne of the law's very objects is the finality of its judgments.  Neither innocence nor just punishment can be vindicated until the final judgment is known.  Without finality, the criminal law is deprived of much of its deterrent effect."  *State v. Moeller*, 511 N.W.2d 803, 808 (S.D. 1994) (quoting *McCleskey v. Zant,* 499 U.S. 467, 491, 111 S. Ct. 1454, 1468, 113 L. Ed. 2d 517, 542 (1991)) (internal quotation marks omitted).  "Moreover, in addition to undermining confidence in the integrity

---

8.	Unlike direct appeal and habeas, a *King* challenge is currently unrestrained by considerations of the finality of judgment.  *See* SDCL 21-27-3.3 (placing two-year statute of limitations upon habeas appeals); SDCL 23A-32-15 (requiring direct appeals to be taken within thirty days).

-14-

of court procedures, these inroads on finality increase the volume of judicial work, inevitably delaying and impairing the orderly administration of justice, . . . which directly contravenes one of the ends of *Boykin,* to wit: to 'forestall the spin-off of collateral proceedings that seek to probe murky memories.'" *Id.* (quoting *Boykin*, 395 U.S. at 244, 89 S. Ct. at 1712-13).[9]  Finally, "perpetual review gives litigants incentives to withhold claims for manipulative purposes and establishes disincentives to present claims when evidence is fresh." *Id.* (internal quotation marks omitted) (citing *McCleskey*, 499 U.S. at 491-92, 111 S. Ct. at 1469).

[¶32.]        Compounding this problem is that we have defined claims like Burkett's as "jurisdictional errors."  As discussed above, while this has long been a recognized exception in habeas, we have not explicitly embraced this fiction for a *King* challenge.  Instead, we have simply treated *King* challenges as similar form of collateral attack without further explanation.  Burkett's case, however, underscores

---

9.    *See also Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 403, 121 S. Ct. 1567, 1573-74, 149 L. Ed. 2d 608 (2001), where the United States Supreme Court noted:

> As we said in *Daniels,* "[t]hese vehicles for review . . . are not available indefinitely and without limitation."  A defendant may choose not to seek review of his conviction within the prescribed time.  Or he may seek review and not prevail, either because he did not comply with procedural rules or because he failed to prove a constitutional violation.  In each of these situations, the defendant's conviction becomes final and the State that secured the conviction obtains a strong interest in preserving the integrity of the judgment.  Other jurisdictions acquire an interest as well, as they may then use that conviction for their own recidivist sentencing purposes, relying on "the 'presumption of regularity' that attaches to final judgments."

*Id.* (alterations in original) (citations omitted).

the problem of embracing the expansive definition of jurisdictional error that the United States Supreme Court specifically rejected in the context of a collateral attack on a predicate conviction.

[¶33.] Prior to being charged with DUI in 2013, Burkett no longer had the ability to raise his *Boykin* claim against his 2003 conviction by direct appeal or a petition for habeas relief. In addition, Burkett could not have raised his alleged *Boykin* violation by a writ of *coram nobis*. *Garcia v. State,* 2014 S.D. 5, ¶ 11, 843 N.W.2d 345, 349. In fact, *Garcia* explicitly rejected the notion that an alleged *Boykin* violation constitutes a "fundamental jurisdictional error." *Id.* Therefore, unless a new fact emerged, Burkett was no longer able to challenge his 2003 convictions prior to being charged with DUI in 2013.

[¶34.] However, once Burkett was charged with DUI in 2013 and a part II information was attached to that charge, Burkett's ability to assert a *Boykin* violation against his 2003 conviction was resurrected, because unlike in *coram nobis*, Burkett's claim is once again defined as a jurisdictional error. Further, Burkett is not required to assert prejudice or actual innocence to get his *Boykin* claim through the door.

[¶35.] As outlined above, the judicial system in South Dakota provides ample opportunity to raise the alleged *Boykin* violation that Burkett asserts. In rejecting a form of relief similar to this type of *King* challenge, other states have recognized that "[a] rational system of criminal justice necessarily favors a process in which criminal cases are completed in a predictable and timely manner." *Johnson*, 38 A.3d at 1277; *see also State v. Boskind*, 807 A.2d 358, 365 (Vt. 2002) ("[E]arly

challenges to convictions ought to be encouraged."). In addition, the United States Supreme Court has stated:

> [A] defendant generally has ample opportunity to obtain constitutional review of a state conviction. But once the door to such review has been closed by the defendant *himself*—either because he failed to pursue otherwise available remedies or because he failed to prove a constitutional violation—the conviction becomes final and the defendant is not entitled to another bite at the apple simply because that conviction is later used to enhance another sentence.

*Daniels v. United States*, 532 U.S. 374, 383, 121 S. Ct. 1578, 1584, 149 L. Ed. 2d 590 (2001) (internal quotation marks omitted) (citations omitted). Given the ample statutory remedies available to Burkett and other similarly situated defendants, Burkett's *King* challenge is not required under due process or South Dakota codified law. Defendants like Burkett are not entitled to "another bite at the apple" merely because their prior convictions now have more force under our sentence-enhancement statutes. They cannot be rewarded for withholding potential claims until they are faced with a heightened sentence. Permitting such a result would undermine the State's valid interest in punishing habitual offenders. *See Parke v. Raley*, 506 U.S. 20, 27-28, 113 S. Ct. 517, 522, 121 L. Ed. 2d 391 (1992).

[¶36.]     In light of the intervening developments in the law since our decision in *King*, we should hold that a *King* challenge is no longer available for an alleged *Boykin* violation. Accordingly, we affirm the circuit court's denial of Burkett's motion to strike his predicate conviction.

[¶37.]     2.     *Whether there was sufficient evidence to support a conviction of driving under the influence.*

[¶38.]     Burkett next challenges the validity of his present conviction.  Burkett argues that the circuit court erred by denying his motion for a judgment of acquittal.  "We review the denial of a motion for judgment of acquittal as a question of law under the de novo standard."  *State v. Riley*, 2013 S.D. 95, ¶ 14, 841 N.W.2d 431, 436 (quoting *State v. Danielson*, 2012 S.D. 36, ¶ 8, 814 N.W.2d 401, 405).  "On appeal, the question before this Court is whether the evidence was sufficient to sustain the conviction."  *Id.* (citation omitted).  "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (citation omitted).  "[W]e will not resolve conflicts in the evidence, assess the credibility of witnesses, or reevaluate the weight of the evidence."  *Id.* (quoting *State v. Hauge*, 2013 S.D. 26, ¶ 12, 829 N.W.2d 145, 149).

[¶39.]     At Burkett's trial, the State offered the testimony of Officer Lux and Henderson.  Both individuals testified that Burkett appeared to be under the influence of alcohol.  In addition to that testimony, the State presented the recording from Officer Lux's patrol car.  No other evidence was admitted at trial as the BAC evidence had been suppressed.  Burkett asserts that the State's evidence was insufficient to establish a conviction under SDCL 32-23-1(2).[10]

---

10.     SDCL 32-23-2-1(2) provides:

> No person may drive or be in actual physical control of any
> vehicle while:

(continued . . .)

[¶40.]        At the outset, the State notes that blood alcohol evidence is not required to sustain a conviction under SDCL 32-23-1(2). In support of its position, the State relies on *State v. Huettl*, 379 N.W.2d 298 (S.D. 1985), where we upheld a DUI conviction under SDCL 32-23-1(2) even though blood alcohol evidence was not submitted at trial. In addition to *Huettl*, we stated in two later cases that the statutory presumption of being under the influence based on a certain blood alcohol percent level is not the ultimate inquiry under SDCL 32-23-1(2). *See State v. Motzko*, 2006 S.D. 13, ¶ 10, 710 N.W.2d 433, 438; *State v. Hullinger*, 2002 S.D. 83, ¶ 14, 649 N.W.2d 253, 259. Instead, the critical analysis under SDCL 32-23-1(2) is whether the person is "under the influence of an alcoholic beverage." *Hullinger*, 2002 S.D. 83, ¶ 14, 649 N.W.2d at 259 (citation omitted). We have recognized that the phrase "under the influence" encompasses:

> not only all well known and easily recognized conditions and degrees of intoxication, but any abnormal mental or physical condition which is the result of indulging in any degree in alcoholic liquor and which tends to deprive the defendant of that clearness of intellect and control of himself which the defendant would otherwise possess.

*Motzko*, 2006 S.D. 13, ¶ 8, 710 N.W.2d at 437 (quoting *Hullinger*, 2002 S.D. 83, ¶ 14, 649 N.W.2d at 259). Therefore, "any abnormal mental or physical condition that deprives an individual of the clearness of intellect and self control that they would otherwise possess will suffice" to establish a violation of SDCL 32-23-1(2). *Id.*

---

(. . . continued)

> (2) Under the influence of an alcoholic beverage, marijuana, or any controlled drug or substance not obtained pursuant to a valid prescription, or any combination of an alcoholic beverage, marijuana, or such controlled drug or substance[.]

[¶41.] In the present case, the evidence was sufficient to support Burkett's conviction for driving under the influence. Both Henderson and Officer Lux testified that Burkett smelled of alcohol, slurred his speech, and that he was incoherent, confused, belligerent, and driving erratically. Additionally, Officer Lux stated that based on his training and experience, Burkett's physical appearance and behavior indicated that Burkett lacked "the clearness of intellect to operate a motor vehicle." In deciding whether the evidence is sufficient to sustain a verdict beyond a reasonable doubt we have stated that our review is limited to whether "there is a rational theory that supports the jury's verdict." *Id.* ¶ 12, 710 N.W.2d at 439 (citation omitted). Given the testimony of both Henderson and Officer Lux, the evidence was sufficient to sustain the jury's verdict.

[¶42.] 3. *Whether the circuit court erred in denying Burkett's motion to suppress based on Officer Lux's stop of Burkett.*

[¶43.] Lastly, Burkett argues the circuit court erred in denying his motion to suppress the evidence against him because Officer Lux did not have reasonable suspicion to justify stopping Burkett's car. "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Rademaker*, 2012 S.D. 28, ¶ 7, 813 N.W.2d 174, 176 (quoting *State v. Wright*, 2010 S.D. 91, ¶ 8, 791 N.W.2d 791, 794).

[¶44.] The Fourth Amendment of the United States Constitution and Article VI, § 11 of the South Dakota Constitution protect individuals from unreasonable searches and seizures. *Id.* ¶ 8, 813 N.W.2d at 176. "[T]he Fourth Amendment's prohibition against unreasonable searches and seizures applies when a car is stopped by law enforcement." *Id.* (citation omitted).

[¶45.]      A police "officer may stop a car, without obtaining a warrant, if there is 'reasonable suspicion that criminal activity may be afoot.'" *Id.* ¶ 9 (quoting *Wright*, 2010 S.D. 91, ¶ 10, 791 N.W.2d at 794). "Reasonable suspicion to stop must be based on 'specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *State v. Herren*, 2010 S.D. 101, ¶ 8, 792 N.W.2d 551, 554 (quoting *State v. Akuba*, 2004 S.D. 94, ¶ 15, 686 N.W.2d 406, 413). "The stop may not be the product of mere whim, caprice or idle curiosity." *Id.* (citation omitted). To determine whether an officer had reasonable suspicion to make an investigatory stop, we look to the "totality of the circumstances." *Rademaker*, 2012 S.D. 28, ¶ 12, 813 N.W.2d at 177 (citation omitted).

[¶46.]      The State argues that Officer Lux's investigatory stop of Burkett was reasonable because of the combination of the tip from Henderson and Burkett's "erratic driving." Burkett contends that Officer Lux did not have reasonable suspicion to make a stop because Henderson's tip was anonymous to Officer Lux, and Officer Lux did not observe Burkett doing anything to independently justify a stop. For purposes of our analysis we assume that Officer Lux was acting on an anonymous tip.[11]

---

11.     Police dispatch conveyed to Officer Lux that an anonymous citizen was concerned about a driver who was possibly under the influence. Dispatch informed Officer Lux that the individual was driving a light blue, older van. Dispatch also gave Officer Lux a license plate number and the registered address of the suspected driver. Although dispatch was aware of the identity of Henderson, this information was not conveyed to Officer Lux. Nor was any additional information hinted to Officer Lux that this was not actually an anonymous tip. At the suppression hearing, the State contended that Officer

(continued . . .)

[¶47.] "The degree to which law enforcement can rely on an anonymous tip depends on the tip's degree of reliability." *Herren*, 2010 S.D. 101, ¶ 17, 792 N.W.2d at 556 (citing *State v. Scholl*, 2004 S.D. 85, ¶ 9, 684 N.W.2d 83, 86). "The tip's degree of reliability depends on the quantity and quality of the tipster's information." *Id.* (citation omitted). "If a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* (citation omitted).

[¶48.] During the pendency of this case, the United States Supreme Court decided *Navarette v. California*, 572 U.S. ___, 134 S. Ct. 1683, ___ L. Ed. 2d ___ (2014), which considered the sufficiency of an anonymous tip to conduct a traffic stop. In *Navarette*, 911 dispatch in Mendocino County, California received a call from dispatch in neighboring Humboldt County. 572 U.S. at ___, 134 S. Ct. at 1686. Humboldt County dispatch relayed that they had received a tip from a 911 call that was recorded as follows: "Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8–David–94925. Ran the reporting party off the roadway and was last seen approximately five minutes ago." *Id.* at ___, 134 S. Ct. at 1686-87. That information was broadcast to highway patrol officers. *Id.* at ___, 134 S.

---

(. . . continued)
Lux relied on the collective knowledge of the dispatcher to establish reasonable suspicion, but this argument was not presented by the State on appeal. We note that there is some conflict in the law as to whether a civilian dispatcher's knowledge can automatically be imputed to an arresting officer without additional information. *See United States v. Colon*, 250 F.3d 130, 137-38 (2d Cir. 2001). Therefore, we do not consider whether the dispatcher's knowledge of Henderson's identity could be imputed to Officer Lux.

#26812

Ct. at 1687. About thirteen minutes after Mendocino County dispatch broadcast the information, a highway patrol officer, heading northbound toward the reported vehicle, passed a pickup matching the caller's description. After making a U-turn, the officer stopped the vehicle. The officer did not observe the pickup violate any traffic laws prior to making the stop. When officers approached the truck, they detected the smell of marijuana. Officers subsequently searched the vehicle and discovered 30 pounds of marijuana. The defendants, Lorenzo Prado Navarette and José Prado Navarette, were arrested. *Id.*

[¶49.] The defendants moved to suppress the marijuana evidence, arguing that the traffic stop violated the Fourth Amendment because the officers did not have reasonable suspicion of criminal activity. *Id.* The United States Supreme Court disagreed, holding that the officers had reasonable suspicion to stop the pickup. *Id.*

[¶50.] In reaching its conclusion that the officers had reasonable suspicion to stop the vehicle, the United States Supreme Court first considered whether the anonymous 911 call was "sufficiently reliable." *Id.* at 1688. The Court noted that a "basis of knowledge lends significant support to the tip's reliability." *Id.* at 1689. The Court reasoned, "[b]y reporting that she had been run off the road by a specific vehicle—a silver Ford F-150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." *Id.* The reliability of the call was further supported by the fact that "[a] driver's claim that another vehicle ran her off the road . . . necessarily implies that the informant knows the other car was driven dangerously." *Id.* Additionally, the Court observed

-23-

that the timeline of events suggested there was reason to believe the caller was telling the truth. *Id.* Roughly 18 minutes after receiving the call, police observed a vehicle, traveling south, matching the caller's description and located 19 miles south of the location identified by the caller. *Id.* Finally, the Court stated that the use of the 911 emergency system also supported the tip's veracity as a 911 call may have "some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Id.* (citation omitted).

[¶51.]     After analyzing the reliability of the call, the Court next considered whether the tip created a reasonable suspicion that "criminal activity may be afoot." *Id.* at 1690. The 911 caller reported that the suspected vehicle ran her off the roadway. *Id.* The Court concluded that this behavior, "viewed from the standpoint of an objectively reasonable police officer, amount[ed] to reasonable suspicion of drunk driving." *Id.* (citation omitted) (internal quotation marks omitted). Notably, the allegations made by the 911 caller were "more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving." *Id.* at 1691. The Court concluded that although the officer did not observe any additional suspicious conduct upon following the vehicle, it did not dispel a reasonable suspicion of drunk driving as the officer only briefly followed the vehicle. *Id.*

[¶52.]     In the instant case, dispatch conveyed to Officer Lux that an individual driving an older, light blue van was potentially under the influence. Dispatch informed Officer Lux that the individual had left the Napa store and would be driving into Deadwood. In addition, dispatch provided Officer Lux with the license

plate number and registered address for the vehicle. Almost immediately after receiving the tip from dispatch, Officer Lux observed a van meeting dispatch's description driving in Deadwood. Officer Lux turned his patrol car around and headed in the direction the van was traveling. At this point, the van was mostly out of sight, but Officer Lux continued in the direction of the registered address. When Officer Lux finally reached the van, he noticed it was stopped in the middle of a residential street and the driver was revving the van's engine. The van resumed driving and then turned right into a driveway.

[¶53.] Officer Lux's stated reason for stopping the van was a combination of both Burkett's "erratic" driving and the tip he received about a suspected driver under the influence. Based on the totality of the circumstances, Officer Lux had reasonable suspicion to stop Burkett, as "[t]he quantum of proof necessary for reasonable suspicion is somewhere above a hunch but less than probable cause." *Herren*, 2010 S.D. 101, ¶ 21, 792 N.W.2d at 557 (citing *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 750, 151 L. Ed. 2d 740 (2002)). Unlike *Navarette*, we need not decide whether the tip alone established reasonable suspicion to effectuate a stop because the information conveyed in the tip, coupled with Officer's Lux's observations of the van's behavior made it reasonable for Officer Lux to temporarily stop Burkett.

[¶54.] That Officer Lux had reasonable suspicion to stop Burkett is also supported by our case law involving anonymous tips of drivers under the influence. *See Herren*, 2010 S.D. 101, ¶ 22, 792 N.W.2d at 557; *Scholl*, 2004 S.D. 85, ¶ 14, 684 N.W.2d at 88. In *Scholl*, we upheld a stop of a suspected drunk driver even though

the officer did not observe any violations of the law or erratic driving. 2004 S.D. 85, ¶ 17, 684 N.W.2d at 89. The tipster in *Scholl* provided officers with a personal observation that the suspected drunken driver was leaving a bar; and the tipster further described the vehicle's make, model, color, and unique Nebraska license number. *Id.* We determined that the tip was reliable enough to yield a reasonable suspicion that the driver was under the influence. *Id.* Meanwhile in *Herren*, we upheld a stop of a suspected drunk driver based on the combination of an anonymous tip and the driver's lengthy stop at a stop sign. 2010 S.D. 101, ¶ 22, 792 N.W.2d at 557. We concluded that the officer had reasonable suspicion to stop the driver based on the totality of the circumstances even though the tipster did not provide a license plate number or an accurate description of the make and color of the vehicle. *Id.*

[¶55.]     While the information conveyed by dispatch to Officer Lux was less in quantity than that in *Scholl*, we note that unlike *Herren*, Officer Lux was given an accurate description of the vehicle and a license plate number. This information, paired with Burkett's stopping and revving his engine in the middle of a residential road gave Officer Lux "more than a hunch of legal wrongdoing." *See Herren*, 2010 S.D. 101, ¶ 22, 792 N.W.2d at 557 (citation omitted).

[¶56.]     Taken individually, the information relayed to Officer Lux may have been minimal, almost conclusory in nature; and Officer Lux's corroboration of the tip involved only a brief observation of erratic driving. But when viewed in totality, the information and observation provided Officer Lux with the reasonable suspicion necessary to make a stop. In balancing an individual's interest to remain free from

government intrusion with the government's substantial interest in intercepting vehicles driven by individuals under the influence, we conclude that Officer Lux's decision to stop Burkett was reasonable. *See United States v. Wheat*, 278 F.3d 722, 736-37 (8th Cir. 2001).

## Conclusion

[¶57.]     We affirm the circuit court's decision.

[¶58.]     SEVERSON, Justice, concurs.

[¶59.]     KONENKAMP, ZINTER, and WILBUR, Justices, concur on Issue 2 and Issue 3.

[¶60.]     **ZINTER, Justice, writing for the Court as to Issue 1.**


ZINTER, Justice (concurring in part and concurring in result in part).

[¶61.]     I concur on issues two and three. On issue one, I concur in result. I cannot join the lead opinion's *sua sponte* reversal of more than twenty-five years of our jurisprudence relating to collateral attacks on predicate convictions used for sentencing enhancement. We should simply address the issue briefed and argued on appeal: whether the circuit court sufficiently canvassed Burkett about his *Boykin* rights before he pleaded guilty in March 2003.

[¶62.]     "*Boykin* requires that before a defendant pleads guilty, he 'be advised of his [federal constitutional] rights relating to self-incrimination, trial by jury, and confrontation,' and 'that [he] intentionally relinquish or abandon known rights.'" *State v. Bilben*, 2014 S.D. 24, ¶ 5, 846 N.W.2d 336, 338 (alterations in original) (quoting *State v. Smith*, 2013 S.D. 79, ¶ 8, 840 N.W.2d 117, 120). Burkett contends

that the March 2003 circuit court failed to adequately advise him of his *Boykin* rights. He also contends that the court failed to advise him that he would waive those rights by pleading guilty.[12] Both contentions fail.

[¶63.] At Burkett's March 2003 arraignment, the circuit court simultaneously advised all defendants present of their rights, including their *Boykin* rights. The court then advised that a guilty plea would "give up [their] right to a jury trial and *all rights* that accompany a jury trial." (Emphasis added.) The court also spoke with Burkett and his attorney to ensure Burkett understood those rights and that his guilty plea was voluntary.

> **Court:** And [Defense Counsel] you've discussed with your client his statutory and constitutional rights and maximum penalties.
>
> **Defense Counsel:** I have, Your Honor.
>
> **Court:** And you're satisfied he understands them?
>
> **Defense Counsel:** Yes, Your Honor.
>
> **Court:** Mr. Burkett, other than what's been discussed in court, have there been any threats or promises made to you to get you to enter a plea of guilty?
>
> **Burkett:** No, sir.

[¶64.] The record reflects that the March 2003 circuit court fully advised Burkett of his *Boykin* rights. It also reflects that the court fully advised Burkett about the waiver effect of a guilty plea. In fact, the waiver advisement given to Burkett is the *same* advisement we approved in *Bilben*. *See* 2014 S.D. 24, ¶ 7, 846 N.W.2d at 338 (approving a general waiver advisement indicating that by pleading guilty, the defendant would "give up his right to a jury trial and all rights that

---

12. Burkett does not argue that his guilty plea was unknowing or involuntary under a totality-of-the-circumstances analysis.

accompany a jury trial"). Thus, like the defendant in *Bilben*, Burkett "was advised that a guilty plea would waive all previously enumerated rights associated with a trial, which included all three *Boykin* rights." *See id.* ¶ 10. The circuit court did not err in denying Burkett's motion to strike his March 2003 conviction.

[¶65.] The lead opinion presents thought-provoking arguments for reexamining the statutory and constitutional underpinnings that govern collateral attacks on predicate convictions in light of *Custis v. United States*, 511 U.S. 485, 114 S. Ct. 1732, 128 L. Ed. 2d 517 (1994). But, as the lead opinion notes, "we have not yet considered the implications of *Custis* on *King* challenges in this state[.]" We must wait for another day to consider this matter. The lead opinion's argument was neither presented below nor briefed on appeal. Therefore, it would be imprudent for us to adopt it *sua sponte*.

[¶66.] This country's judicial system is grounded on an adversarial process in which opposing sides have notice and an opportunity to be heard before a decision is made. Bypassing the adversarial process today could result in just as significant an oversight as the lead opinion argues occurred in *State v. King*, 383 N.W.2d 854 (S.D. 1986), and our cases since *Custis*. We should give the parties notice and an opportunity to be heard. We should at least hear the opposing argument before we adopt such a significant change in our law.

[¶67.] KONENKAMP and WILBUR, Justices, concur.