#26579-a-DG

**2013 S.D. 94**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                Plaintiff and Appellee,

    v.

JEFFREY SCOTT MOHR,                Defendant and Appellant.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KATHLEEN K. CALDWELL
Retired Judge

* * * *

MARTY J. JACKLEY
Attorney General

BETHANY L. ERICKSON
Assistant Attorney General
Pierre, South Dakota                Attorneys for plaintiff
                                    and appellee.


MOLLY QUINN of
Minnehaha County Public Defender's Office
Sioux Falls, South Dakota                Attorneys for defendant
                                         and appellant.

* * * *

ARGUED NOVEMBER 5, 2013
OPINION FILED **12/18/13**

#26579

GILBERTSON, Chief Justice

[¶1.]    Defendant Jeffrey Scott Mohr was convicted of possession of a
controlled substance, possession of drug paraphernalia, and obstructing a law
enforcement officer, after being mistakenly identified as a suspected armed robber
and detained by police.  Mohr appeals, alleging officers did not have reasonable
suspicion of criminal activity to stop or frisk Mohr.  Mohr asserts that evidence
against him was obtained in violation of his Fourth Amendment right against
unreasonable search and seizure and that the trial court erred by denying a motion
to suppress the evidence.

**Facts and Procedural History**

[¶2.]    Mary Griffith was working as a casino attendant at Deuces Casino in
Sioux Falls, South Dakota, on the afternoon of August 3, 2011.  Defendant Jeffrey
Scott Mohr entered the casino, wearing sunglasses and a baseball cap.  Mohr got
change, snacks, and a drink, and began gambling at the machines.  Griffith
immediately became frightened, concerned that Mohr was an unidentified fugitive
who had robbed other casinos in the area and was in the process of "casing the
place" as his next target.

[¶3.]    A number of recent armed robberies in the area had placed casino
owners, employees, and law enforcement on heightened alert.  Griffith's friend, who
worked at another casino in Sioux Falls that had been robbed, told Griffith that the
robber had entered the casino wearing a baseball cap and sunglasses, got a snack, a
drink, and change, and then proceeded to play the machines for some time before
robbing the casino.  Griffith's manager had also placed a "wanted" poster up in

-1-

Deuces Casino for employees to see. The poster was created by another casino in Sioux Falls and showed three pictures of an armed robbery in progress, taken from a casino video surveillance camera. The suspect pictured in the photos was a Caucasian male wearing sunglasses and a baseball cap, holding up a casino at gunpoint. The manager informed employees not to hesitate to call police if they believed the person pictured on the poster was in the casino.

[¶4.] While Mohr was playing a video lottery machine, Griffith surreptitiously conferred with two regular customers of the casino. After showing the customers the poster, the customers agreed that Mohr looked like the man pictured on the poster. Griffith then pushed the casino's "panic button." In response to the panic button, Metro Communications phoned the casino and spoke with Griffith. The dispatcher informed Griffith that if she did not feel safe talking, Griffith could answer yes and no questions and pretend that someone else was calling. A very frightened Griffith was able to relay that "he" was inside the casino and that she and two customers thought it "certainly looked like him." Griffith indicated that she wasn't able to tell if Mohr was armed, but she was able to relay to the dispatcher Mohr's location within the casino. Metro Communications dispatched law enforcement to the scene while staying on the telephone with Griffith.

[¶5.] When officers arrived, Griffith indicated toward Mohr, who was seated at a video lottery machine. Although it was dark inside the casino, Mohr was still wearing sunglasses and had his baseball cap pulled down over his face. Mohr was asked to step outside. Mohr was accompanied outside by Officers Chris Bauman

and Ryan Sandgren, who asked Mohr for an identification card, his birthdate, and his address. Mohr complied.

[¶6.]     Meanwhile, inside the casino, Griffith explained to Officers Nick Cook and Andrew Siebenborn why she had made the call. Griffith then showed the officers the poster with the photos of the robbery in progress at another casino. Officer Siebenborn examined the poster and agreed that Mohr appeared to be the same person depicted on the poster robbing the casino. Knowing that the previous robberies had involved weapons, Officer Siebenborn went outside to speak with the other officers and Mohr and ensure that Mohr had been patted down for weapons.

[¶7.]     Once outside, Officer Siebenborn learned that Mohr had not been patted down. At that time, Officer Siebenborn observed that Mohr seemed "jittery and somewhat nervous." He asked Mohr to place his hands against the building and initiated a frisk of Mohr's outer clothing. Officer Siebenborn felt a wallet in Mohr's pocket, but also a hard object Officer Siebenborn believed to be a weapon— potentially a penknife or pocket knife.

[¶8.]     As Officer Siebenborn attempted to verify the identity of the item and look into the pocket, Mohr tensed up and spun around. Mohr was handcuffed and placed under arrest for obstruction of a law enforcement officer. A subsequent search of Mohr's pocket revealed that the object in question was a hypodermic needle. The search also uncovered a glass pipe with suspected methamphetamine residue and a small baggie containing a white crystal or powder. Laboratory testing later confirmed the presence of methamphetamine in the baggie and on the pipe.

[¶9.]    Mohr cooperated with further police investigation and was cleared of any connection to the casino robberies. However, Mohr was charged with Possession of a Controlled Substance (Methamphetamine), in violation of SDCL 22-42-5 and SDCL 34-20B-16(6), Obstructing Law Enforcement Officer, in violation of SDCL 22-11-6, and Possession of Drug Paraphernalia, in violation of SDCL 22-42A-3. Mohr was arraigned on September 14, 2011 and entered a plea of not guilty to all charges. On February 22, 2012, Mohr moved to suppress all evidence found on his person as the product of an illegal search and seizure. A hearing on the motion was held June 28, 2012 in front of the Honorable Peter Lieberman. The court heard testimony from Griffith and the responding officers. The court denied the motion.

[¶10.]    After the suppression hearing, the case was reassigned to the Honorable Kathleen K. Caldwell. Mohr appeared in front of Judge Caldwell on August 13, 2012 and waived his right to a jury trial. A trial by the court was held October 15, 2012. The court found Mohr guilty on all counts. Mohr was given a suspended sentence of five years in prison, on the conditions that Mohr serve two years of formal probation and submit to weekly drug testing for a period of six months. Mohr appeals his conviction, raising one issue: whether the trial court erred in denying Mohr's motion to suppress evidence based on the alleged violation of Mohr's Fourth Amendment rights. We affirm.

## Analysis and Decision

[¶11.]    1.    *Whether the trial court erred in denying Mohr's motion to suppress evidence based on an alleged violation of Mohr's Fourth Amendment rights.*

[¶12.]    Mohr argues that the evidence against him in this case was the product of an illegal search and seizure, in violation of his Fourth Amendment

rights. "This Court reviews the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard." *State v. Bonacker*, 2013 S.D. 3, ¶ 8, 825 N.W.2d 916, 919 (quoting *State v. Overbey*, 2010 S.D. 78, ¶ 11, 790 N.W.2d 35, 40). The trial court's findings of fact are reviewed under the clearly erroneous standard, but we give no deference to the trial court's conclusions of law. *Id.* (citation omitted).

[¶13.] "The Fourth Amendment's prohibition against unreasonable searches and seizures requires generally the issuance of a warrant by a neutral judicial officer based on probable cause prior to the execution of a search or seizure of a person." *State v. Sound Sleeper*, 2010 S.D. 71, ¶ 15, 787 N.W.2d 787, 791 (citations and internal quotation marks omitted). However, if law enforcement officers lack the probable cause necessary to effectuate a custodial arrest, officers may perform a brief, investigative stop based on reasonable suspicion. *Id.* (citing *State v. DeLaRosa*, 2003 S.D. 18, ¶ 7, 657 N.W.2d 683, 685-86).

[¶14.] This Court has noted that it is impossible to articulate a precise definition of reasonable suspicion. *State v. Quartier*, 2008 S.D. 62, ¶ 10, 753 N.W.2d 885, 888 (citing *State v. Aaberg*, 2006 S.D. 58, ¶ 10, 718 N.W.2d 598, 600). *See also Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct. 1657, 1661, 134 L. Ed. 2d 911 (1996) ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible."). Thus, this Court applies "a common-sense and non-technical approach to determining reasonable suspicion, one that deals with the practical considerations of everyday life." *Sound Sleeper*, 2010 S.D. 71, ¶ 16, 787 N.W.2d at 791 (citing *Quartier*, 2008 S.D. 62, ¶ 10, 753 N.W.2d 885 at 888). A

reviewing court must look to the "totality of the circumstances" to determine whether the officer had a "particularized and objective basis" for suspecting criminal activity. *State v. Johnson*, 2011 S.D. 10, ¶ 8, 795 N.W.2d 924, 926 (citation omitted). The factual basis needed to support an officer's reasonable suspicion is minimal. *State v. Satter*, 2009 S.D. 35, ¶ 6, 766 N.W.2d 153, 155 (citing *State v. Scholl*, 2004 S.D. 85, ¶ 6, 684 N.W.2d 83, 85). "All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity." *Id.* (quoting *Scholl*, 2004 S.D. 85, ¶ 6, 684 N.W.2d at 85).

[¶15.] Mohr first argues that the officers in question lacked the reasonable suspicion necessary to justify even a brief investigatory stop. Mohr points to language in *State v. Haar*, where we noted:

> The critical question is, "would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction."

2009 S.D. 79, ¶ 22, 772 N.W.2d 157, 167 (quoting *Terry v. Ohio*, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873, 20 L. Ed. 2d 889 (1968)). Although Mohr acknowledges that we analyze the officer's actions under the totality of the circumstances, he emphasizes that the facts available to the officers were limited at the time officers seized Mohr. Mohr asserts that officers only knew that the casino attendant triggered the duress alarm, that the casino attendant believed the suspect from earlier robberies was in the casino, that Mohr was wearing a hat and sunglasses, and that Mohr was playing video lottery when officers arrived. He argues that because these facts do

not indicate any criminal wrongdoing by Mohr, officers could not have had a reasonable suspicion to subject him to an investigatory detention. We disagree.

[¶16.] We have previously explained that courts are not to "examine innocent explanations for the reasonable suspicion facts standing alone, a process which the Supreme Court described as a 'divide and conquer' analysis." *Id.* ¶ 23 (quoting *Quartier*, 2008 S.D. 62, ¶ 15, 753 N.W.2d at 889). The totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750-51, 151 L. Ed. 2d 740 (2002)).

[¶17.] Viewing the totality of the circumstances in this case, including reasonable inferences and deductions made by the officers, we cannot conclude that the officers in this case were acting on "an inarticulate hunch," or that Mohr's seizure was the product of "mere whim, caprice, or idle curiosity." *See Haar*, 2009 S.D. 79, ¶ 22, 772 N.W.2d at 167; *Satter*, 2009 S.D. 35, ¶ 6, 766 N.W.2d at 155. Although the facts listed by Mohr correctly state the information conveyed to the officers by the dispatcher, those facts alone do not provide a complete picture of the totality of circumstances at the time of the seizure.

[¶18.] First, the officers in this case possessed knowledge beyond what had been relayed to them by Griffith. Law enforcement personnel are allowed to rely upon information conveyed by one officer to another for determinations of probable cause and reasonable suspicion through the collective knowledge doctrine. *State v. Richards*, 1998 S.D. 128, ¶ 15, 588 N.W.2d 594, 597 (citation omitted). Applying

this doctrine, "the facts and knowledge of all the officers are viewed collectively." *Id.* ¶ 18 (citing *State v. Krebs*, 504 N.W.2d 580, 586 (S.D. 1993); *State v. Baysinger*, 470 N.W.2d 840, 844-45 (S.D. 1991); *State v. Czmowski*, 393 N.W.2d 72, 73 (S.D. 1986)). None of the officers in this case were directly involved with the investigations of the prior casino robberies. However, Officer Siebenborn testified that it was relayed to him, before the events giving rise to this case, that the suspect in the earlier robberies had entered the casinos wearing a baseball cap and sunglasses, and spent some time gambling before robbing the casinos with a weapon. Under the collective knowledge doctrine, we analyze the officers' actions in this case in light of these additional facts.

[¶19.] Equipped with this knowledge of the prior robberies, the officers responded to an emergency "panic button" call from a casino attendant. When the officers arrived at the scene, a frightened employee, Griffith, indicated toward Mohr. Although he did not seem to be presently engaged in any illegal activity, Mohr was seated at a machine in an ill-lit casino, wearing sunglasses and a baseball cap "pulled over his eyes substantially." This behavior and dress may have seemed only marginally suspicious in isolation, but it corresponded with the officers' collective knowledge of the dress and habits of the suspect in the prior robberies. The similarities between Mohr and the suspect, and the broader circumstances of an emergency call about a potential robbery, support the conclusion that the officers were acting on more than a "whim, caprice, or idle curiosity" when they seized Mohr. *See Satter*, 2009 S.D. 35, ¶ 6, 766 N.W.2d at 155 (citation omitted).

[¶20.]     The fact that Griffith was an identifiable source of information, rather than an anonymous tipster, is another factor that supports the officers' reasonable suspicion. An informant's tip may support the reasonable suspicion necessary for an investigative detention. *See Scholl*, 2004 S.D. 85, ¶ 6, 684 N.W.2d 83 at 85. The reliability of an informant's tip is greater when the informant is known or identifiable, rather than anonymous, in part because the informant can be held accountable if the allegations turn out to be fabricated. *See Satter*, 2009 S.D. 35, ¶¶ 9-12, 766 N.W.2d at 155-56. *See also* SDCL 22-11-9 (classifying false reporting of an emergency or crime as a Class I misdemeanor). Although Griffith only identified herself as "Mary" during the emergency call, authorities knew that an employee at Deuces Casino had pushed the alarm. Griffith was present at the casino when officers arrived, and pointed Mohr out to the officers. By openly identifying herself to authorities, Griffith lent at least some measure of reliability to her claim of a present emergency caused by Mohr's presence in the casino.

[¶21.]     Mohr attacks the reliability of Griffith as an informant by pointing out that the "primary determinant of a tipster's reliability is the basis of [the tipster's] knowledge." *Scholl*, 2004 S.D. 85, ¶ 10, 684 N.W.2d 83, 87. Because Griffith had not witnessed Mohr commit any criminal activity, and because Griffith's knowledge was only through secondhand accounts and photos from a wanted poster,[1] Mohr

---

1.     Focusing specifically on the poster in this case, Mohr distinguishes this case from both *United States v. Hensley*, 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985) and *State v. Krebs*, 504 N.W.2d 580 (S.D. 1993). In both *Hensley* and *Krebs*, *Terry* stops based on reasonable suspicion were upheld where officers acted in reliance on police-issued bulletins describing the suspect. In both cases, the description or identity of the suspect was known to police at

(continued . . .)

argues that Griffith's "tip" to police could not be reliable enough to supply reasonable suspicion. This argument again takes an improper "divide and conquer" approach to the reasonable suspicion analysis.

[¶22.] If Griffith's call is classified as a mere "tip" from an informant, and is viewed in isolation, it might lack the factual basis for police to have a reasonable suspicion of criminal activity. Mohr correctly points out that Griffith did not relay any articulable facts of her firsthand observation of a crime in progress. The emergency call only relayed what Mohr was wearing, where Mohr was in the casino, and the vague statement that "it sure looks like him." Even if those facts were corroborated, Mohr asserts that officers could not connect Mohr's actions with any criminal wrongdoing. However, we again must view Griffith's call as part of the totality of the circumstances confronting the officers in this case.

[¶23.] When Griffith contacted police, it was not a simple informant's tip, on which the police could act in slow and calculated manner. It was an emergency call, which often demands swift action, working with less information. When officers entered the casino, Griffith immediately indicated toward Mohr. Although the officers did not know exactly what Mohr had done, it was reasonable for the officers to rely on their training and experience and infer that the emergency call to police

_____

(. . . continued)

the time of seizure and police were acting in reliance on those descriptions. Mohr is correct that these facts are distinguishable. The officers in this case were not familiar with the particular identity or physical description of the robbery suspect before seizing Mohr, and the poster in this case was not issued by police, nor was it seen by the officers before they seized Mohr. However, the officers' familiarity with the suspect's physical appearance would only be one factor to consider and is not essential to a finding of reasonable suspicion in this case.

and the indication toward Mohr meant that it was likely Mohr had done something criminal and sufficiently threatening in nature to warrant the call.[2] The overall tone and nature of the call—an identified, concerned citizen feeling so threatened that she is unable to speak openly with a dispatcher—further supports the officers' reasonable suspicion of criminal activity.

[¶24.]     In light of the totality of the circumstances supporting the officers' reasonable suspicion of criminal activity, we next look at the actions taken by the officers. Although the officers in this case did not possess the probable cause necessary for an immediate arrest, we have noted that "*Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." *Johnson*, 2011 S.D. 10, ¶ 16, 795 N.W.2d 924 at 928 (quoting *State v. Boardman*, 264 N.W.2d 503, 506 (S.D. 1978)). "A brief stop of a suspicious individual, in order to determine his identity and maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* (quoting *Boardman*, 264 N.W.2d at 506).

[¶25.]     The intermediate response taken by the officers in this case—asking Mohr for identification and asking him to step outside the casino for further questioning—was reasonable. These actions allowed police to momentarily

---

2.     On similar facts, in *State v. Hunter*, a Florida appellate court upheld a temporary seizure where a gas station clerk could not talk when she called 911, and thus relayed no facts about the crime or suspected criminal. 615 So. 2d 727 (Fla. Dist. Ct. App. 1993). When officers arrived minutes after receiving the call, the distressed clerk pointed at the defendant. *Id.* at 730. The court held that even though no articulable facts of crime had been conveyed during the call, officers had reasonable suspicion because of the call and the fact that "retail establishments of this type . . . are popular targets of armed robberies." *Id.*

maintain the status quo, especially the safety of Griffith and others in the casino, while gathering more information to either confirm or dispel concerns of dangerous criminal activity. The officers were taking the reasonable steps any officer would have taken under the circumstances. Thus, viewing these actions in light of the totality of the circumstances, we conclude that the police did not violate Mohr's Fourth Amendment rights by temporarily detaining him outside of the casino for questioning.

[¶26.] Mohr further argues that the subsequent pat-down of his person was not justified, even if police had reasonable suspicion to seize him. If an officer believes that "the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884-85. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *State v. Shearer*, 1996 S.D. 52, ¶ 18, 548 N.W.2d 792, 796 (citation omitted).

[¶27.] Mohr argues that officers were not justified in patting him down, because the officers observed no weapons and Mohr was not acting in a disorderly or threatening manner. Mohr notes that "the officers who spent five minutes talking to Mr. Mohr believed that he was not a threat." Mohr asserts that a frisk is only justified "where nothing in the initial stages of the encounter serves to dispel [the

officer's] reasonable fear for his own or others' safety." *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884.

[¶28.] Although the officers outside with Mohr did not feel immediately threatened, Officer Siebenborn knew that the dress and behavior exhibited by Mohr matched that of the armed casino robbery suspect. The similarities between Mohr and the prior armed robberies were reinforced by information Officer Siebenborn gained while talking inside with Griffith and looking at the pictures of a prior robbery in that area. What is learned during the course of an officers' investigation should not be ignored. *See Speten v. State*, 185 P.3d 25, 34 (Wyo. 2008) ("*Terry* certainly should not be read so narrowly as to allow a weapons search at the onset, or not at all."). *See also State v. Faulks*, 2001 S.D. 115, ¶ 16, 633 N.W.2d 613, 619 ("We will not fault police officers for failing to pat-search an individual before that person is a suspect in a crime."). Upon seeing the photo of the robbery in progress, Officer Siebenborn was equipped with even greater knowledge of the potential danger Mohr posed.

[¶29.] Because Officer Siebenborn knew the prior robberies involved weapons and he reasonably believed that Mohr may have been the perpetrator of those robberies, it was reasonable for him to believe that Mohr was armed. Furthermore, Officer Siebenborn noted that Mohr acted "jittery and excited" when Officer Siebenborn came out of the casino, adding to a fear that Mohr might be concealing a weapon. The totality of the circumstances supports Officer Siebenborn's belief that a frisk was necessary to ensure the safety of those present, even if the other officers failed to immediately recognize that threat. Because the stop and frisk of Mohr was

reasonable, police had probable cause to arrest Mohr for obstructing a law enforcement officer, and the subsequently discovered evidence is admissible.

## Conclusion

[¶30.]    Under the totality of the circumstances, Mohr was not subjected to an unreasonable search or seizure in violation of his Fourth Amendment rights. Therefore, we affirm.

[¶31.]    KONENKAMP, ZINTER and SEVERSON, Justices, and BROWN, Circuit Court Judge, concur.

[¶32.]    BROWN, Circuit Court Judge, sitting for WILBUR, Justice, disqualified.