#27769-r-DG
**2017 S.D. 12**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*


STATE OF SOUTH DAKOTA,                            Plaintiff and Appellee,

    vs.

STEVEN ALEXANDER STANAGE,                 Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GREGORY J. STOLTENBURG
Judge

\* \* \* \*


MARTY J. JACKLEY
Attorney General

CRAIG M. EICHSTADT
Assistant Attorney General
Pierre, South Dakota                              Attorneys for plaintiff
                                         and appellee.


DONALD M. MCCARTY
BENJAMIN KLEINJAN  of
Helsper, McCarty &
  Rasmussen, P.C.
Brookings, South Dakota                       Attorneys for defendant
                                         and appellant.

\* \* \* \*

ARGUED OCTOBER 5, 2016
OPINION FILED **04/05/17**

#27769

GILBERTSON, Chief Justice

[¶1.] Steven Alexander Stanage appeals from a final judgment of conviction for driving under the influence. Stanage argues the circuit court erred in denying his motion to suppress evidence obtained during a traffic stop and subsequent blood draw. According to Stanage, the arresting officer lacked a reasonable basis to conclude Stanage had committed a crime. We reverse.

## Facts and Procedural History

[¶2.] Shortly before 2 a.m. on October 26, 2014, in Brookings, South Dakota, Stanage ordered food at the drive-up window of a Hardee's restaurant. Adam Hill, an employee working at the window, noticed Stanage's eyes were bloodshot and his speech slurred. Stanage also had some difficulty grasping the beverage he had ordered. Hill reported his observations to James Debough, his shift supervisor. Debough, in turn, contacted the police and told a dispatcher that a potentially drunk driver was parked at the window. Debough described Stanage's vehicle as a "car" and gave its license-plate number but did not relay Hill's observations regarding Stanage's eyes, speech, and motor control. Debough told the dispatcher the employees had delayed Stanage's order to stall his departure.

[¶3.] The dispatcher contacted Brooking's County Sheriff's Deputy Jeremy Kriese, who was only one block away from the Hardee's. The dispatcher gave Deputy Kriese the license-plate number and told him that Hardee's employees were holding Stanage at the drive-up window, but the dispatcher did not provide any additional information regarding the informants' identities to Deputy Kriese. At Deputy Kriese's request, the Hardee's employees "released" Stanage. After Stanage

-1-

drove away from Hardee's, Deputy Kriese immediately initiated a traffic stop. Deputy Kriese did not independently observe any suspicious behavior—the stop was predicated entirely on the information provided by the dispatcher. Deputy Kriese approached the vehicle and detected an overwhelming odor of alcohol emanating from it. Deputy Kriese administered field sobriety tests and based on the results, arrested Stanage for driving under the influence. Stanage submitted to a blood draw, and an analysis of his blood revealed a blood alcohol content of 0.204% at approximately 2:28 a.m.

[¶4.]     Stanage was charged with driving a vehicle while under the influence of alcohol as a first offense. The case was first tried in magistrate court. Stanage moved to suppress all evidence resulting from the stop, including the results of the blood test. At the suppression hearing, Hill testified about the observations he made on October 26—i.e., Stanage's bloodshot eyes, slurred speech, and motor-control difficulty. The court denied Stanage's motion and convicted him of driving while under the influence. Stanage appealed the magistrate court's decision to the circuit court, which affirmed.

[¶5.]     Stanage appeals, raising one issue: Whether Deputy Kriese had reasonable suspicion to justify the traffic stop.

## Standard of Review

[¶6.]     "[W]e review a motion to suppress evidence obtained in the absence of a warrant de novo." *State v. Walter*, 2015 S.D. 37, ¶ 6, 864 N.W.2d 779, 782 (citation omitted). "[W]e review the circuit court's factual findings for clear error

but 'give no deference to the circuit court's conclusions of law.'" *Id.* (quoting *Gartner v. Temple*, 2014 S.D. 74, ¶ 8, 855 N.W.2d 846, 850).

Analysis and Decision

[¶7.] The Fourth Amendment protects a person from "unreasonable searches and seizures[.]" U.S. Const. amend. IV. This protection generally requires "that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure[.]" *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968). However, "[t]he Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, ___ U.S. ___, ___, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)). The totality of the circumstances determines whether such a particularized and objective basis exists. *Id.* "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Id.* (citation omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989)).

[¶8.] The information known to Deputy Kriese at the time of the stop was limited. Although Hill had observed that Stanage's eyes were bloodshot, his speech was slurred, and his motor skills were impaired, this information was not known to law enforcement at the time of the stop. Therefore, Hill's observations may not be

considered in determining whether Deputy Kriese had a particularized and objective basis for suspecting Stanage was intoxicated. *See Florida v. J.L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 1379, 146 L. Ed. 2d 254 (2000) ("The reasonableness of official suspicion must be measured by what *the officers* knew *before* they conducted their search." (emphasis added)).[1] Additionally, the State concedes that Deputy Kriese did not independently observe any criminal activity or erratic driving on Stanage's part.[2] Thus, the stop was predicated entirely on the conclusory assertion of unidentified-but-identifiable informants and a positive identification of Stanage's vehicle.

[¶9.] The initial question in cases like this is whether the tip is credible. *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1688. The State contends that a finding of reasonable suspicion is supported because the informants were identifiable. Stanage contends that "[t]he call to Brookings dispatch that Deputy Kriese relied on was an anonymous tip." The credibility of an informant is enhanced when the informant places his anonymity at risk. *See id.* at ___, 134 S. Ct. at 1689-90. While "an unnamed individual who divulges enough distinguishing characteristics to limit

---

1. The dissent argues that it was reasonable for Deputy Kriese to "infer" a factual premise for the informants' *conclusion* that Stanage was intoxicated. *See infra* ¶ 30. But a conclusion is inferred from a factual premise, not the other way around. *See Black's Law Dictionary* (10th ed. 2014) (defining *inference* as a "conclusion reached by considering other *facts* and deducing a logical consequence *from them*." (emphasis added)). While an officer may make rational inferences from known *facts*, *Terry*, 392 U.S. at 21, 88 S. Ct. at 1880, he may not simply assume an informant's conclusion is correct, *see infra* ¶ 10 & n.3.

2. Independent observation is not required to form a particularized and objective basis for suspecting criminal activity, but it can compensate for an insufficient tip. *See Navarette*, ___ U.S. at ___, 134 S. Ct. at 1688.

his possible identity to only a handful of people may be nameless, . . . he is capable of being identified and thus is not anonymous." *United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) (quoting *United States v. Brown*, 496 F.3d 1070, 1075 (10th Cir. 2007)); *accord State v. Mohr*, 2013 S.D. 94, ¶ 20, 841 N.W.2d 440, 446; *see also Navarette*, ___ U.S. at ___, 134 S. Ct. at 1689-90 (considering law enforcement's ability to identify 911 caller as bolstering credibility of an unidentified informant). Although Deputy Kriese did not know the specific identities of the informants at the time of the stop, he did know they were Hardee's employees working at the time of the stop. Thus, for purposes of credibility, the informants in this case were not anonymous, which enhances the reliability of the tip.

[¶10.]        Regardless, "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1690 (quoting *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884); *accord J.L.*, 529 U.S. at 272, 120 S. Ct. at 1379. The requirement that an officer have reasonable suspicion prior to a stop is not abrogated simply because a third-party informant is convinced a crime occurred. As noted above, an officer's "mere 'hunch' does not create reasonable suspicion[.]" *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1687. "[N]either does a private citizen's." *United States v. Wheat*, 278 F.3d 722, 732 (8th Cir. 2001). Even if an informant is credible, "[s]ufficient information must be presented to the [officer] to allow *that official* to determine [reasonable suspicion]; his action cannot be a mere ratification of the bare

conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317, 2333,

76 L. Ed. 2d 527 (1983) (emphasis added).[3]

[¶11.]        When an officer is not given an "explicit and detailed description of

alleged wrongdoing," *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1689, the officer must

have some other reason to believe the informant's conclusion is correct.

> If, for example, a particular informant is known for the unusual
> reliability of his predictions of certain types of criminal activities
> in a locality, his failure, in a particular case, to thoroughly set
> forth the basis of his knowledge surely should not serve as an
> absolute bar to a finding of [reasonable suspicion] based on his
> tip.

*Gates*, 462 U.S. at 233, 103 S. Ct. at 2329-30; *see also Adams v. Williams*, 407 U.S.

143, 146, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612 (1972) (upholding conclusory tip

from known informant who had previously given accurate information).  Even if an

informant has not previously provided information to the officer, the officer's

ratification of the informant's conclusion may be objectively reasonable if the officer

is aware that the informant has special training or experience relating to the

conclusion at issue.[4]  In this case, however, the record does not reflect that the

informants had previously demonstrated unusual reliability in identifying

intoxicated drivers.  Even if they had, Deputy Kriese was unaware of the

---

3.    *Gates* addresses the related context of a magistrate's probable-cause
      determination.  The reasoning is equally applicable to an officer's reasonable-
      suspicion determination.  While the burden of proof is less in the reasonable-
      suspicion context, in either case the burden of determining whether
      reasonable suspicion (or probable cause) exists belongs to the magistrate or
      officer and not to some third party.

4.    For example, a veteran law-enforcement officer, emergency-room physician,
      or bartender might identify intoxication more reliably than the average
      person.

informants' identities at the time he stopped Stanage, so such a circumstance—even if reality—could not possibly have informed Deputy Kriese's reasonable-suspicion determination.[5]

[¶12.] Even so, the State contends it was reasonable to ratify the informants' conclusion because Deputy Kriese confirmed the identifying detail provided by the informants—i.e., the license-plate number. However, the United States Supreme Court has specifically rejected the notion that identifying details like this can corroborate an allegation of criminal activity.

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. *Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.* The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*J.L.*, 529 U.S. at 272, 120 S. Ct. at 1379 (emphasis added). Stanage does not dispute that Deputy Kriese had sufficient information to identify Stanage's vehicle. But the tip in this case consisted only of "easily obtained facts and conditions existing at the time of the tip[;]" it does not suggest the informants had "reliable information of [Stanage's] alleged illegal activities." *Gates*, 462 U.S. at 245,

---

5. The dissent primarily focuses on the credibility of the informants in this case. As noted above, we agree the informants were credible. *Supra* ¶ 9. However, the basis of knowledge of even an "unquestionably honest citizen" is subject to some scrutiny. *See Gates*, 462 U.S. at 233-34, 103 S. Ct. at 2330 ("[*R*]igorous scrutiny of the basis of [an unquestionably honest citizen's] knowledge [is] unnecessary." (emphasis added)). In other words, the question in this case is not whether Deputy Kriese had reason to believe the informants were telling the truth; the question is whether he had reason to believe they correctly concluded criminal activity was occurring.

103 S. Ct. at 2335-36. Thus, under *J.L.*, while the identifying detail provided to Deputy Kriese makes the tip more reliable in the sense that it positively identified Stanage's vehicle, that detail does not support the conclusion that Stanage was engaged in illegal activity.

[¶13.]     A number of Fourth Amendment decisions suggest that under these circumstances, Deputy Kriese did not have a particularized and objective basis for suspecting Stanage was intoxicated. In *Navarette*, the Supreme Court reviewed a tip from an unidentified 911 caller. The tip, as relayed to an officer, said: "Showing southbound Highway 1 at mile marker 88, Silver Ford 150 pickup. Plate of 8–David–94925. Ran the reporting party off the roadway and was last seen approximately five minutes ago." *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1686-87. California Highway Patrol officers located the described vehicle and initiated a traffic stop based solely on the tip. *Id.* at ___, 134 S. Ct. at 1687. The Supreme Court acknowledged that it was a "close case." *Id.* at ___, 134 S. Ct. at 1692. Even so, the Court upheld the stop because the informant was identifiable and "reported more than a minor traffic infraction and *more than a conclusory allegation of drunk or reckless driving*. Instead, she alleged a specific and dangerous result of the driver's conduct: running another car off the highway." *Id.* at ___, 134 S. Ct. at 1691 (emphasis added). Unlike *Navarette*, the tip in the present case reported merely a conclusory allegation of drunk or reckless driving. Considering that the United States Supreme Court identified *Navarette* as a close case, the absence of one of the

major factors relied on by the Supreme Court in reaching its decision strongly suggests the present case falls short of reasonable suspicion.[6]

[¶14.] A case with facts analogous to *Navarette* is *State v. Scholl*, 2004 S.D. 85, 684 N.W.2d 83. In that case, an unidentified-but-identifiable informant reported a possibly drunk driver. *Id.* ¶ 2, 684 N.W.2d at 84. Like *Navarette* but unlike the present case, the tip included an explicit description of the alleged offender's behavior. The informant reported "seeing the driver 'leaving [a] bar stumbling pretty badly and having problems getting into his . . . pickup.'" *Id.* The informant also provided information sufficient for law enforcement to correctly identify the vehicle. *Id.* A police officer stopped the vehicle based solely on the tip. *Id.* ¶ 3, 684 N.W.2d at 84. As the Supreme Court did in *Navarette*, we upheld the stop in *Scholl* because the informant "describe[d] non-driving conduct that yielded a reasonable suspicion that the driver was driving while under the influence of alcohol." *Scholl*, 2004 S.D. 85, ¶ 17, 684 N.W.2d at 89. Unlike the present case, "[t]he tipster provided the basis of his information and suspicion, i.e., personal

---

6. The dissent claims "the particular circumstances of *Navarette* distinguish it from the present facts." *Infra* ¶ 26. There is no basis for such a claim. In *Navarette*, the Supreme Court considered that the informant's use of the 911 system enabled law enforcement to identify the informant. ___ U.S. at ___, 134 S. Ct. at 1689-90. Thus, in *Navarette*, the informant was unidentified but identifiable. In the present case, the informants were also unidentified but identifiable. As explained above, an informant that is identifiable is not anonymous. *Sanchez*, 519 F.3d at 1213; *accord Mohr*, 2013 S.D. 94, ¶ 20, 841 N.W.2d at 446; *see also Navarette*, ___ U.S. at ___, 134 S. Ct. at 1689-90. So contrary to the dissent's claim, the present case is identical to *Navarette* in this regard.

   Regardless, the dissent's argument misses the mark. We agree that the informants in this case were credible. *See supra* ¶ 9. But the problem is the content of the tip, not its trustworthiness. *See supra* ¶ 10 & n.3.

observation of the driver stumbling badly from a bar and having trouble getting into his vehicle." *Id.*

[¶15.]     In upholding the stop at issue in *Scholl*, we examined similar cases from other jurisdictions.

> In *State v. Miller*, 510 N.W.2d 638 (N.D. 1994), the North Dakota Supreme Court invalidated a traffic stop based upon an informant's report of a possible drunk driver who could "barely hold his head up" in the drive-up lane of a fast food restaurant. In *Stewart v. State*, 22 S.W.3d 646 (Tex. Ct. App. 2000), the Texas Court of Appeals invalidated a stop based upon an informant's report of an intoxicated driver at a convenience store who fell down twice while getting into his vehicle. . . .
>
> . . . *We perceive a distinction between observations at a fast food restaurant* such as in *Miller, supra*[,] or at convenience store as in *Stewart, supra*[,] *and observations at a bar where the likelihood of alcohol consumption is obviously enhanced.* It requires no leap of logic or common sense to deduce that a person stumbling from a bar late in the evening and exhibiting difficulty getting into his vehicle may well be under the influence of alcohol and incapable of safely operating the vehicle. . . .

*Scholl*, 2004 S.D. 85, ¶¶ 13-14, 684 N.W.2d at 88 (emphasis added).  We explicitly stated: "Moreover, we find it important in cases of this nature that the basis of the tipster's knowledge or suspicion be communicated to law enforcement." *Id.* ¶ 14, 684 N.W.2d at 88.  Unlike *Navarette, Scholl, Miller*, and *Stewart*, the basis of the informants' conclusion in this case was not communicated to Deputy Kriese. Additionally, unlike *Scholl*, the location at issue in this case was a fast-food restaurant and not a bar.

[¶16.]     Our decisions involving conclusory tips also support the conclusion that Deputy Kriese did not have a reasonable suspicion of criminal activity.  In *State v. Burkett*, 2014 S.D. 38, 849 N.W.2d 624, an unidentified-but-identifiable

informant contacted law enforcement to report a possibly intoxicated driver. As in the present case, the tipster relayed identifying information of the alleged offender. We noted that the tip was "minimal, almost conclusory in nature[.]" *Id.* ¶ 56, 849 N.W.2d at 638. However, unlike the present case, the officer independently observed the alleged offender stop his vehicle "in the middle of a residential street and rev[] its engine for no apparent reason." *Id.* ¶ 8, 849 N.W.2d at 626. Thus, although "the information conveyed to [the officer] was less in quantity than that in *Scholl*," *Burkett*, 2014 S.D. 38, ¶ 55, 849 N.W.2d at 638, "[u]nder the totality of the circumstances, the officer's corroboration of the tip by 'a brief observation of erratic driving' compensated for an otherwise anemic tip[,]" *Walter*, 2015 S.D. 37, ¶ 11, 864 N.W.2d at 785 (citation omitted) (quoting *Burkett*, 2014 S.D. 38, ¶ 56, 849 N.W.2d at 638).

[¶17.]    In *Mohr*, we reviewed the investigative stop of an alleged offender after a casino attendant—who was unidentified but identifiable—triggered a duress alarm. The only other information known to the responding officers was that "the casino attendant believed the suspect from earlier robberies was in the casino, that Mohr was wearing a hat and sunglasses, and that Mohr was playing video lottery when officers arrived." *Mohr*, 2013 S.D. 94, ¶ 15, 841 N.W.2d at 445. We recognized that the informant "did not relay any articulable facts of her firsthand observation of a crime in progress" and that "viewed in isolation, [the tip] might lack the factual basis for police to have a reasonable suspicion of criminal activity." *Id.* ¶ 22, 841 N.W.2d at 447. "[W]e upheld the detention and search because the officers were familiar with the circumstances of the prior robberies, the attendant

was an identifiable source, and the nature of an emergency call limited the ability of the officers to investigate." *Walter*, 2015 S.D. 37, ¶ 12, 864 N.W.2d at 785 (discussing *Mohr*, 2013 S.D. 94, ¶¶ 18-23, 841 N.W.2d at 445-47).[7]  Aside from the

---

7.  Relying on *State v. Tucker*, 878 P.2d 855 (Kan. Ct. App. 1994), and *State v. Rutzinski*, 623 N.W.2d 516 (Wis. 2001), the dissent argues that the protections of the Fourth Amendment apply with lesser force when law enforcement is confronted with the possibility of public danger. *See infra* ¶¶ 34-37.  According to the dissent, "[t]he risk to the public in not immediately stopping the vehicle was 'death and destruction on the highways.  This is not a risk which the Fourth Amendment requires the public to take.'" *Infra* ¶ 35 (quoting *Tucker*, 878 P.2d at 862).  Yet in *Tucker*, the anonymous tip actually "indicated that the defendant . . . *had been running other drivers off of the road*." *Tucker*, 878 P.2d at 858 (emphasis added).  Likewise, the tip in *Rutzinski* actually alleged the defendant's vehicle was "weaving within its lane, varying its speed from too fast to too slow, and 'tailgating.'" 623 N.W.2d at 519.  Thus, the tips in *Tucker* and *Rutzinski*—like the tip in *Navarette* but unlike the tip in the present case—involved more than a conclusory allegation of drunk or reckless driving. *See supra* ¶ 13.

Even if the dissent were able to cite a case in which a court upheld—out of concern for public safety—a stop based on a conclusory allegation of drunk driving, the United States Supreme Court squarely rejected such an argument in *J.L.*  In that case, the State of Florida and the United States argued that "a tip alleging an illegal gun [should] justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." *J.L.*, 529 U.S. at 272, 120 S. Ct. at 1379.  After recognizing "the serious threat that armed criminals pose to public safety[,]" the Supreme Court said:

> *Terry*'s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern.  But an automatic firearm exception to our established reliability analysis would rove too far.  Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun.  Nor could one securely confine such an exception to allegations involving firearms.  Several Courts of Appeals have held it *per se* foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well.  If police officers may properly

(continued . . .)

ability to identify the informants, none of these other factors are present in Stanage's case.

[¶18.] In each of the foregoing decisions, the stop at issue was upheld either because of independent observation by law-enforcement officers or because the tip itself demonstrated the informant's basis of knowledge for alleging criminal conduct. In this case, the report Deputy Kriese received "did not articulate any *facts* describing illegal conduct or any conduct that would otherwise give rise to an inference of criminal activity. [Deputy Kriese] did not corroborate the report's conclusory assertion by personal observation of [Stanage]." *Id.* ¶ 13, 864 N.W.2d at 785 (emphasis added). Thus, under *Navarette*, *Scholl*, and the other authorities

_____

(. . . continued)

> conduct *Terry* frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in *Adams* and *White,* the Fourth Amendment is not so easily satisfied.

*Id.* at 272-73, 120 S. Ct. at 1379-80. As indicated by the Supreme Court, *Terry's* reasonable-suspicion standard already limits the individual protection of the Fourth Amendment by striking a balance between the need to protect the public and the need to protect the individual. The foregoing is equally applicable to the dissent's argument in this case. For the reasons expressed by the Supreme Court, we must also reject the dissent's public-safety argument.

Finally, the Supreme Court did not rely on any sort of public-safety exception to the Fourth Amendment in its totality-of-the-circumstances analysis in *Navarette*. The dissent does not cite to any Supreme Court decisions on this point, let alone one decided after *Navarette*.

discussed above, the totality of the circumstances in this case did not provide a reasonable suspicion of criminal activity.[8]

Conclusion

[¶19.]	Deputy Kriese did not have sufficient information regarding Stanage's behavior to form his own conclusion that Stanage was intoxicated. Neither did Deputy Kriese have a particularized and objective basis to ratify the informants' conclusion that Stanage was intoxicated. Under *Navarette*, a conclusory allegation of drunk or reckless driving is insufficient to support a reasonable suspicion of criminal activity. Therefore, Deputy Kriese did not have a reasonable suspicion of criminal activity, and any evidence resulting from the stop was the product of an illegal search. The circuit court erred in denying Stanage's motion to suppress.

[¶20.]	We reverse.

[¶21.]	ZINTER, SEVERSON, and WILBUR, Justices, concur.

[¶22.]	KERN, Justice, dissents.


KERN, Justice (dissenting).

[¶23.]	I respectfully dissent. Upon examination of the totality of the circumstances, it is apparent that Deputy Kriese was not acting on an "inarticulate hunch," but rather a "particularized and objective" basis providing reasonable

---

8.	As discussed above, even a conclusory allegation of criminal conduct can support a finding of reasonable suspicion under the right circumstances. *See supra* ¶ 11. To avoid situations like this, however, we encourage law-enforcement officers simply to ask for details when confronted with a tip like the one in this case. Had Hill's observations been relayed to Deputy Kriese, the result of this case likely would be different.

suspicion to stop Stanage. Debough, the supervisor from Hardee's, reported that his employee working at the drive-through window was delaying a driver he believed to be drunk. The manager remained on the line with dispatch until law enforcement told him to release the driver because Deputy Kriese had reported he was at the location. When viewing the evidence from Deputy Kriese's perspective, the tip was contemporaneous and reliable, and the unique circumstance of a drive-through interaction renders the tip sufficient to warrant the stop.

[¶24.] It is well established that officers may perform a brief investigative stop based on reasonable suspicion. As attempting to articulate an exact definition of reasonable suspicion is "not possible," we use a "common-sense and non-technical approach" that accounts for "the practical considerations of everyday life." *State v. Sound Sleeper*, 2010 S.D. 71, ¶ 16, 787 N.W.2d 787, 791. "The factual basis needed to support an officer's reasonable suspicion is minimal." *State v. Satter*, 2009 S.D. 35, ¶ 6, 766 N.W.2d 153, 155. "All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity." *State v. Scholl*, 2004 S.D. 85, ¶ 6, 684 N.W.2d 83, 85. The stop must simply be based upon "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant" a brief investigative detention. *Id.* In determining whether reasonable suspicion exists, a court must "take[] into account 'the totality of the circumstances—the whole picture.'" *Navarette v. California*, ___ U.S. ___, ___, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)).

[¶25.]     The majority, citing *Navarette*, contends that Deputy Kriese lacked reasonable suspicion because he relied upon a "merely . . . conclusory allegation of drunk or reckless driving." *Supra* ¶ 13.  In *Navarette*, the United States Supreme Court upheld an officer's stop of a motorist that was based on an anonymous caller's report that a vehicle drove her off the road.  ___ U.S. at ___, 134 S. Ct. at 1686.  In that case, the report included "more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving."  *Id.* at ___, 134 S. Ct. at 1691.  From this language, the majority concludes that—without more than a conclusory allegation—"the present case falls short of reasonable suspicion." *Supra* ¶ 13.

[¶26.]     But the particular circumstances of *Navarette* distinguish it from the present facts.  As the majority agrees, the tipster in *Navarette* was an anonymous-but-identifiable caller.  The United States Supreme Court noted that the 911 emergency system used by the tipster "has *some* features that allow for identifying and tracing callers, and thus provides *some* safeguards against making false reports with immunity."  *Id.* at ___, 134 S. Ct. 1689 (emphasis added).  Thus, given "technological and regulatory developments," the United States Supreme Court noted that "a reasonable officer could conclude that a false tipster would think twice before using such a system."  *Id.* at ___, 134 S. Ct. 1690.  Here, however, although dispatch did not convey to Deputy Kriese Debough's identity or the identity of the employee at the drive-through window, a reasonable officer under the circumstances could conclude that their identities were known to law enforcement.  Moreover, Debough and his staff members were available and could be held

immediately accountable if they gave false information—indeed, much more readily than tracking down an unidentified-but-potentially-identifiable caller to 911.[9]

[¶27.] The United States Supreme Court in *Navarette* then examined whether the conduct alleged suggested that the driver was intoxicated. *Id.* at ___, 134 S. Ct. at 1690. In cases where a motorist alleges that another vehicle is being driven by an intoxicated driver, such behavior may very well "be explained by, for example . . . an unruly child or other distraction." *Id.* at ___, 134 S. Ct. at 1691. Moreover, "not all traffic infractions imply intoxication." *Id.* at ___, 134 S. Ct. at 1690. It would be patently unreasonable for officers to stop every vehicle accused—even if fully believed—of some instance of erratic driving. Thus, the allegations must "create[] reasonable suspicion that 'criminal activity may be afoot.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1885, 20 L.Ed.2d 889 (1968)). The United States Supreme Court highlighted the critical fact that the conduct bore "too great a resemblance to paradigmatic manifestations of drunk driving [that could not] be dismissed as an isolated example of recklessness." *Id.* at ___, 134 S. Ct. at 1691. But this does not mean that only manifestations of drunk driving contained within the report made in *Navarette* will satisfy the criteria for reasonable suspicion. "[T]here is more than one way to demonstrate 'a particularized and objective basis for suspecting the particular person stopped of

---

9. Debough's information, like that contained in the tip in *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612, 617 (1972), "was immediately verifiable at the scene," and the tipster could be subject to arrest for making a false report. This increases the reliability of the tip.

criminal activity.'" *Id.* at ___, 134 S. Ct. at 1692 (quoting *Cortez*, 449 U.S. at 417-418, 101 S. Ct. at 695).

[¶28.] Here, the majority faults Debough for not conveying the cashier's observations of the driver's slurred speech, bloodshot eyes, and lack of motor control to dispatch, and in turn to Deputy Kriese. When analyzing the information received in a tip, we have said that a "tip's degree of reliability depends on the quantity and quality of the tipster's information." *State v. Burkett*, 2014 S.D. 38, ¶ 47, 849 N.W.2d 624, 636. And we have said that "[i]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion that would be required if the tip were more reliable." *Id.* Thus, when a tip is particularly reliable, less information is needed.[10] *See Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). In terms of reliability, firsthand observations entitle a tip "greater weight than might otherwise be the case." *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1689 (quoting *Spinelli v. United States*, 393 U.S. 410, 416, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)). An anonymous tip—if sufficiently reliable—may alone provide reasonable suspicion to justify a stop. *State v. Lownes*, 499 N.W.2d 896, 899 (S.D. 1993) (anonymous tip detailing the vehicle and route taken by an allegedly intoxicated motorcyclist held sufficiently predictive to justify a *Terry* stop); *see also White*, 496 U.S. 325, 332, 110 S. Ct. at 2417 (anonymous tip with sufficient indicia of reliability may justify investigative stop).

---

10. Provided, of course, that the information suggests ongoing criminal activity. *Navarette*, ___ U.S. at ___, 134 S. Ct. at 1690.

[¶29.] So what information did Deputy Kriese have from which to form reasonable suspicion, which is a minimal standard lower than probable cause? The recording of the call to dispatch reveals that Debough told law enforcement that "my cashier" says we have "a drunk driver at [the] window." Debough gave dispatch the license plate number of the vehicle and told dispatch that they were "holding [Stanage] right now." Debough can be heard conversing back and forth with employees. Dispatch asked Debough to stay on the line as dispatch relayed the information to all officers in the area. Deputy Kriese responded and asked, "What was that traffic stop at Hardee's?" Deputy Kriese also indicated that he was "a block away." Dispatch informed Deputy Kriese that there was a "signal 8 [suspected drunk driver] at Hardee's, [and] they are holding him at the window." At this point, Deputy Kriese told dispatch to "tell [Debough, who was still holding for dispatch] to turn them loose," as Deputy Kriese was in the immediate vicinity. Dispatch relayed this information to Debough. Deputy Kriese observed a vehicle pull away from the Hardee's drive-through window and, before performing the stop, confirmed the license plate number given to him by dispatch.

[¶30.] Even though Deputy Kriese was unaware that Debough himself did not observe the suspicious behavior by the individual driving the car, he could make certain "commonsense inference[s.]" *Sound Sleeper*, 2010 S.D. 71, ¶ 17, 787 N.W.2d at 792. From the location of the report—a fast-food, drive-through window—Deputy Kriese could conclude that the cashier had the opportunity and proximity to form firsthand conclusions. Debough could reasonably infer that the cashier was actively engaged in verbal communications with the driver, first at the

ordering stage via speaker and then in a hand-to-hand exchange of payment for food or beverages at the window. This routine transaction would allow an employee to assess the driver's rate and clarity of speech, his facial expressions, his mannerisms, and his motor skills. And in this case, the observations were so significant that the employees chose to call law enforcement and delay the driver until an officer could respond. Additionally, the tip was made in the early morning hours on a Sunday around 2:00 a.m., which supports the inference of drunk driving. *See Scholl*, 2004 S.D. 85, ¶ 14, 684 N.W.2d at 88 (location where observation of intoxication was made affected the likelihood that alcohol was consumed and thus of intoxicated driving); *People v. Barbarich*, 807 N.W.2d 56, 63 (Mich. Ct. App. 2011) (circumstances such as the fact it was Saint Patrick's Day and that a large party was held nearby supported stop of a motorist alleged to have "almost hit" another car).

[¶31.] Detaining a customer at a drive-through window is highly unusual, and going to such lengths to hold a suspect lends credence to the belief that "criminal activity may be afoot." *Navarette*, ___ U.S. at ___, 134 S Ct. at 1690 (quoting *Terry*, 392 U.S. at 30, 88 S. Ct. at 1885). Further, the fact that the tipster's employee was actively engaging with the suspect during the call to dispatch (i.e., the tip was made contemporaneous to the illegal conduct) adds additional support to the tip's reliability, reducing the need for additional information. *See Navarette*, ___ U.S. at ___, 134 S. Ct. at 1689-90. Deputy Kriese's investigatory stop was the direct result of this call for assistance and cannot be said to have been made on the

basis of "mere whim, caprice, or idle curiosity." *Scholl*, 2004 S.D. 85, ¶ 6, 684 N.W.2d at 85.

[¶32.]    The majority, citing *State v. Mohr*, 2013 S.D. 94, 841 N.W.2d 440, distinguishes the present case from one involving an emergency call concerning a robbery suspect, where the circumstances limited the ability of officers to investigate further before deciding whether to stop a suspect. *Supra* ¶ 17. However, the operation of a vehicle by an intoxicated driver also creates both an emergency and exigent circumstances. "An erratic and possibly drunk driver poses an imminent threat to public safety." *United States v. Wheat*, 278 F.3d 722, 736 (8th Cir. 2001).

> [W]here an anonymous tip alleges . . . [a] possibly drunk driv[er], a responding officer faces a stark choice. . . . [H]e can intercept the vehicle immediately and ascertain whether its driver is operating under the influence of drugs or alcohol. Or he can follow and observe, with three possible outcomes: the suspect drives without incident for several miles; the suspect drifts harmlessly onto the shoulder, providing corroboration of the tip and probable cause for an arrest; or the suspect veers into oncoming traffic, or fails to stop at a light, or otherwise causes a sudden and potentially devastating accident.

*Id.* at 736-37. Such circumstances certainly "limit[] the ability of the officers to investigate." *State v. Walter*, 2015 S.D. 37, ¶ 12, 864 N.W.2d 779, 785 (discussing *Mohr*, 2013 S.D. 94, ¶¶ 18-23, 841 N.W.2d at 445-47). "Certainly more facts could have strengthened the officer's suspicion, but in cases involving tips of erratic driving of a motor vehicle, fewer facts are necessary to justify an investigative stop." *Barbarich*, 807 N.W.2d at 63.

[¶33.]    As we have previously noted, in the absence of probable cause, "*Terry* recognizes that it may be the essence of good police work to adopt an intermediate

response." *Mohr*, 2013 S.D. 94, ¶ 24, 841 N.W.2d at 447. Waiting "to personally observe [a] defendant engage in dangerous and erratic driving" goes beyond the minimally necessary "reasonable, articulable suspicion and become[s] probable cause to seize defendant and issue an appropriate citation." *Barbarich*, 807 N.W.2d at 63-64. "A brief stop of a suspicious individual, in order to determine his identity and maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.*

[¶34.]        Citing *Florida v. J.L.*, 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000), the majority concludes there is no "public-safety exception" to the Fourth Amendment. *Supra* ¶ 17 n.7. While there is no per se exception, it is well established that an "exigency can in some circumstances supplement the reliability of an informant's tip in order to form the basis for an investigative stop." *State v. Rutzinski*, 623 N.W.2d 516, 524 (Wis. 2001) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S. Ct. 447, 455, 148 L. Ed. 2d 333 (2000) for the proposition that the "exigencies of some scenarios likely would outweigh the individual's right to be free from an investigative traffic stop[.]"). Further, *J.L.* is readily distinguishable from this case. In *J.L.*, an anonymous caller made an unrecorded call to police from an unknown location reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268, 120 S. Ct. at 1377. Officers stopped J.L. and found him in possession of a gun. J.L.'s motion to suppress the stop was denied and he was convicted. Upon review, the United States Supreme Court held that because the

informant was anonymous, the tip must bear at least "moderate indicia of reliability" such as that "present in *White.*" *Id.* at 271, 120 S. Ct. at 1379. Finding that "[a]ll police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.," *id.*, the Court concluded that the stop was unconstitutional. While the Court declined to adopt a "firearm exception" to standard *Terry* requirements despite "the serious threat that armed criminals pose to public safety," *id.* at 272, 120 S. Ct. at 1379, it nonetheless indicated that the danger alleged by a tip is a factor in the analysis, such that "a report of a person carrying a bomb [might not] need bear the indicia of reliability we demand for a report of a person carrying a firearm . . . ." *Id.* at 273-74, 120 S. Ct. at 1380.

[¶35.] Other courts have examined the sufficiency of tips resulting in investigatory stops by examining the competing principles of public safety and the protections of the Fourth Amendment. The Kansas Court of Appeals in *State v. Tucker,* 878 P.2d 855, 858 (Kan. Ct. App. 1994) considered a case involving an anonymous tip of erratic driving in which the caller provided the type of vehicle and location of travel. Officers located and stopped the car without first making observations of erratic driving. As the court aptly noted, cases of this nature involve

> the ever-changing equation used to balance the rights of an individual to be free from unwarranted intrusions of his or her freedom of movement and right to privacy with the right of the public to be protected from unreasonable danger. This equation and the balance change with the facts presented. The risk to the public in this case was *not* that an illegal drug or a concealed weapon might go undetected. This risk here was a drunk driver

maneuvering a thousand pounds of steel, glass and chrome down a public road.

*Id.* at 858. The court concluded that it is necessary to "consider the risk to the public of not making an immediate stop against the right of an individual to be free from such stops. . . . [W]here the danger to the public is clear, urgent, and immediate, the equation must be weighted in favor of protecting the public and removing the danger." *Id.* at 861. The risk to the public in not immediately stopping the vehicle was "death and destruction on the highways. This is not a risk which the Fourth Amendment requires the public to take." *Id.* at 862.

[¶36.]     As the Wisconsin Supreme Court in *Rutzinski* observed, allegations of erratic driving are distinct because intoxicated motorists "pose[] an imminent threat to the public's safety," as compared to offenses where the defendant is believed to possess guns or drugs. 623 N.W.2d at 526. The *Rutzinski* court, in holding a stop based on an allegation of erratic driving constitutional, analyzed the spectrum of tips delineated by the holdings in *Adams* and *White.* The Wisconsin Supreme Court described the tip in *Adams* as one involving circumstances where "police receive a tip from an informant whom they are reasonably justified in believing to be truthful[.]" This is in contrast to *White*, where the tip involved a "a totally anonymous informant [who] provides the police with a tip which, through independent police investigation or other corroboration, indicates that the informant possesses 'inside information.'" *Id.* at 522. Examining these cases, the Wisconsin Supreme Court observed that the stop in *J.L.* was unconstitutional because, unlike *Adams*, the tip relied upon did not come from a known informant who could be held responsible or whose reputation could be assessed. Moreover, law

enforcement failed under *White* to corroborate the tip with anything more than "easily obtainable information that tends to identify the suspect." *Id.* at 524. The *Rutzinski* court also noted that in *J.L.*, the tip did not suggest an imminent threat to public safety. *Id.* at 526. Without suggesting that any such threat might eliminate the requirements of the Fourth Amendment, the Wisconsin Supreme Court nevertheless concluded that exigency might *supplement* the reliability of the tip and further justify an investigatory stop. *Id.*

[¶37.] Indeed, this "potential risk of harm to the defendant and the public is widely acknowledged to be a critical factor in assessing the reasonableness of an investigatory stop." *State v. Lamb*, 720 A.2d 1101, 1104 (Vt. 1998). When balancing the risk of harm to the public in the present case with the minimal intrusion necessitated by Deputy Kriese's investigatory stop, the "scale of justice . . . must favor the stop; a reasonable officer could not have pursued any other prudent course." *State v. Boyea*, 765 A.2d 862, 868 (Vt. 2000). And *Navarette*—although postdating these cases—does not stand for a contrary principle.

[¶38.] Admittedly, this case involves a close call. But *Navarette* is factually distinguishable and does not require suppression. Under these unique circumstances, where an immediately identifiable informant's employees are on the line with dispatch and actively delaying a suspected drunk driver who is positioned behind the wheel of a car at a drive-through window, Deputy Kriese had a particularized and objective basis to stop Stanage. Given the totality of the circumstances and the context in which the tip was made, the court correctly denied the motion to suppress.